INTERSTATE COMMERCE COMMISSION AND THE UNITED STATES *v.* BALTIMORE AND OHIO RAILROAD COMPANY, PENNSYLVANIA RAILROAD COMPANY ET AL.

APPEAL FROM THE UNITED STATES COMMERCE COURT.

No. 719. Argued January 12, 15, 1912.—Decided June 7, 1912.

An interstate carrier may not charge a different rate for the transportation of raiload-fuel coal to a given point than for the transportation of commercial coal to the same point. It would be an illegal preference or discrimination under § 3 of Act to Regulate Commerce.

Tariffs are but forms of words, and the Interstate Commerce Commission, in the exercise of its powers to administer the Act to Regulate Commerce, can look beyond the forms to what caused them and what they are intended to, and do, cause.

A railroad company cannot be made a favored shipper and given a lower rate on the same commodity to the same point than other persons.

A railroad company is not to be put on the same basis as a locality and entitled to preferential rates to accommodate competitive conditions. *The Import Rate Case*, 162 U. S. 197, distinguished.

THE question in the case is whether railroad companies may charge a different rate for the transportation of coal to a given point to railroads than to other shippers, the coal being intended for the use of the railroads as fuel.

The Interstate Commerce Commission held that a charge of a different rate was an unlawful discrimination against other shippers and made an order requiring a cessation of such charge. The execution of the order was enjoined by the Commerce Court.

A number of railroads are petitioners and we shall refer to them as the companies.

The companies attack in their petition the order of the Interstate Commerce Commission on several grounds, which may be summarized as follows: The movement of coal traffic from the point of origin to the point or points of junction to receiving carriers is different from the movement of coal to be delivered locally at such junction points.

The traffic is not governed by the rates published under the Act to Regulate Commerce which apply to the traffic in coal not intended for use by consuming railroads, because the charges go to the carrier itself. If the coal be shipped under a through rate applicable to other coal the actual rate upon which it moves to the rails of the consuming road is the division of the through rate going to the roads over which the traffic moves to the junction point with the rails of the consuming road. The division of the rate beyond that point goes to the consuming road itself.

All but an inconsiderable part of such coal is necessary and intended for use as fuel in locomotives. The fueling stations are often many, and are located at convenient points along the line at varying distances from the junction points, and it is not possible at the time of shipment to tell at what point a carload of coal will be needed. If made on a through rate they must be billed and transported to a point to which the through rate is published. Even if a centrally located distributing yard for fuel be established, and all shipments billed on a through rate to that yard, there must be a reverse movement of the coal between that point and the point of junction.

The fact that fuel coal on the line of a consuming carrier is not governed by the published rates makes the commercial competitive conditions different between such coal and other coal. The value to the shipper is not the same or measured by the same conditions. There is no competition between the fuel coal and other coal.

Because of the circumstances and conditions differentiating the traffic in fuel coal the companies have for a number of years past published and filed, as required by law, separate tariffs of the rates to be charged and received by them for the transportation of such coal from points of origin to the junction point of delivery to the consuming carrier. The tariffs vary in their definitions or descriptions of the traffic to which the rates apply, but in each case the traffic is such that it would move in reality, not under the published through rates, but would move under the special conditions which have been stated. Some of the tariffs apply only to coal intended for use and used for locomotive fuel. The rates named in the tariffs are open and available to all producers and shippers, if the shipments be made under the special conditions stated.

On January 4, 1910, the Interstate Commerce Commission, of its own motion, instituted an inquiry under an

order of that date entitled, "In the matter of Restrictive
Rates," Docket No. 3053, making the Baltimore & Ohio
and the Pennsylvania Railroad companies parties to the
proceeding. The other companies from time to time were
admitted as intervenors. Testimony was taken, argument
heard, and the Commission entered the order complained
of in which the Commission required the companies to
cease and desist, on or before May 15, 1911, and for a pe-
riod of two years to abstain from using the tariffs on fuel
coal stated.

The Commission erred in its construction of the Act to
Regulate Commerce in that it held the facts and circum-
stances found by it did not distinguish fuel coal from other
coal, and that the different conditions of their transporta-
tion were not in law circumstances and conditions neces-
sary or proper to be considered in applying the provisions
of § 2 of the act.

The Commission erred in holding that the rates on fuel
coal under § 2 should be no more nor less than rates for
the shipment of other coal from the same point of origin
for local delivery at the junction point, the circumstances
and conditions showing conclusively that the services
done in the transportation of them, respectively, are not
alike nor substantially similar, within the meaning of the
Act to Regulate Commerce.

The Commission erred in holding that fuel coal should
be transported under through rates, as other coal, and that
it was unlawful for carriers to publish or charge any rates
other than the through rates agreed upon going to the
line of the terminal carrier to be used by it in its business
as a common carrier. And that, as the charges on such
terminal carrier's line must be borne by it, the Commis-
sion erred in holding that such circumstance did not dif-
ferentiate the traffic in such coal from the traffic in other
coal, and did not constitute a substantial difference under
§ 2 in the conditions of transportation.

The Commission erred in holding, further, that any difference in the tariff for fuel coal and not applicable to all other coal was unjustly discriminatory, in violation of § 3.

It appears on the face of the report of the Commission, it is alleged, that it proceeded in making the order upon its view of §§ 2 and 3; that it did not find it necessary to consider any specific tariff or tariffs or the rates named thereby; that the difference in conditions affecting the respective tariffs could not be considered as distinguishing them. And it is alleged that the findings of the Commission are findings of law, as well in regard to the violation of the third section of the act as in regard to violation of the second section. Irreparable damage is alleged, and the alternatives presented of desisting from the carriage of fuel coal at the expense of the loss of large and valuable revenues or accepting divisions of through rates, on both fuel coal and other coal, which will give the companies, as originating or intermediate carriers, a much lower compensation for both classes of traffic than they are now receiving and would continue to receive but for the order of the Commission.

In either case the loss will amount to many thousand dollars. There will be loss, it is alleged, to the producers of fuel coal who have sold coal under contracts for future delivery at junction points, and loss also to producers and shippers who depend on the railroad-fuel business to enable them to operate their mines at all.

A final decree is prayed for the annulment of the order and a temporary injunction enjoining and suspending it pending final hearing and determination.

The petition was supported by affidavits made by a number of coal producers and shippers.

The answer of the Interstate Commerce Commission is directed principally at the third paragraph of the petition, and charges against it as follows: Its allegations relate to

comparisons between coal, on the one hand, consigned to a railroad company, and coal, on the other hand, consigned to some other party. The former is called railroad-fuel coal, the latter is known as commercial coal. In each instance, however, regardless of the consignee, the point of origin and the point of destination of the shipments is the same, but the rate charged for transporting fuel coal is much less than the rate exacted for the transportation of commercial coal over the same line, in the same direction and between the same points. Schedules or tariffs providing for such differences in rates have been heretofore established and put in force and are now maintained and enforced by the companies.

Where the destination is a junction which is a point of connection between the lines of two or more of the companies, the movement of coal, fuel and commercial, is the same, except that at such destination the cars containing fuel coal are ordinarily placed upon what is called an exchange track, which is used in common by the connecting carriers, while the cars containing commercial coal are usually placed upon the side track of the delivering carrier. The cost of delivering both kinds of coal is practically the same, depending upon the nature of the delivery facilities furnished by the companies. Therefore, the cost of delivering fuel coal may be and is less than the cost of delivering the commercial coal, but the reverse is sometimes the case. It is alleged, however, that such differences are similar to differences pertaining to some shipments of commercial coal compared with other shipments.

Generally what is called "free time" is allowed by the companies, that is to say, a certain period of time for unloading the coal is allowed. If the coal is unloaded within that time, no charge is made for the use of the car. If that time be exceeded a charge of $1.00 for each day or fraction of a day in excess of the "free time," known as a demurrage charge, is exacted by the companies, while the

compensation paid by one carrier to another carrier for the use of a car owned by the latter is twenty-five cents a day. Where the coal transported is fuel coal no "free time" is allowed, nor is such demurrage charge exacted or collected. These differences, however, are offset, and much more than offset, by the differences in the rates of transportation between the different coals.

Where the destination of the shipment of coal is not a point of connection between the lines of two or more of the companies the circumstances and conditions pertaining to the transportation and delivery of coal are the same as above described, except that at such destination there are no exchange tracks used in common by two or more of the companies. Where the shipment passes over more than one line of railway to such destination, delivery by one of the companies to another is made in the same way and under similar circumstances and conditions regardless of whether the coal be fuel or commercial.

The lower rates established by the companies and applied by them to the transportation of fuel coal are not open alike to all shippers but are, by reason of the schedules and tariffs above mentioned and by reason of the practices of the companies, confined to shippers of fuel coal and denied to shippers of all other coal, including commercial coal.

The Commission denies the errors attributed to it, and alleges that its report shows as follows: "We have never held that the local rate to the junction point must be paid on shipments that are going beyond that point. What we have said is that the local rate to the junction point shall be the same for all shippers to that point, and that the through charges on shipments going beyond the junction point shall be alike for all shippers to the same destination."

The Commission alleges (somewhat singularly, on information and belief) that it considered all facts, circum-

stances and conditions pertinent to the subject-matter of the order, including degrees of difference and distinction, and each and all of the tariffs and rates of the companies which are affected by the order, and did not entertain the opinion attributed to it, that the facts, circumstances and conditions affecting the particular traffic could not be lawfully considered by it as distinguishing the traffic in railroad-fuel coal from the traffic in other coal.

It is alleged that the traffic is interstate, and that fuel coal as compared with other coal, including commercial coal, is a like kind of traffic; that the services performed by the companies in connection with the transportation of fuel coal as compared to the services performed by them in connection with the transportation of other coal, including commercial coal, are alike and contemporaneous, and are performed under substantially similar circumstances and conditions. It is hence alleged that the companies are violating §§ 2 and 3 of the Interstate Commerce Act.

The final allegation of the Commission is that the matters are within its jurisdiction, and that therefore the correctness of its findings is not open to review in the Commerce Court or any other court.

*Mr. P. J. Farrell* for the Interstate Commerce Commission:

In failing to dismiss the bill for want of equity, and in granting the temporary injunction, the Commerce Court committed errors which should be corrected by a reversal of the decree.

Circumstances and conditions arising before traffic is delivered by the consignor to the carrier for transportation at point of origin, and those arising after the traffic is delivered by the carrier to the consignee at point of destination, cannot be used to justify disparities in rates, where, as here, the transportation is over the same line, in the same direction, and between the same points.

*Wight* v. *United States*, 167 U. S. 512, 518; *Int. Com. Comm.* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 166, 167; *Int. Com. Comm.* v. *Delaware, L. & W. R. R. Co.*, 220 U. S. 235, 252–254. If circumstances and conditions arising after the traffic is delivered by the consignor to the carrier at point of origin and before it is delivered by the carrier to the consignee at point of destination, but which are wholly artificial and entirely created by the carriers, may be used to justify such disparities, a carrier cannot be prevented from indulging in such discriminations as it may wish to make, to the extent at least of charging one party a rate greater than the rate it contemporaneously accords to another party, for the transportation of a like kind of traffic, over the same line, in the same direction, and between the same points.

While a carrier may transport its own property at will from one point to another upon its own line, regardless of the rates named in its published schedules, provided the title to that property does not change while it is in transit; and the division of a through rate for the transportation of property from a point of origin on the line of one carrier to a point of destination on the line of another carrier are a matter of agreement by and between the carriers who perform the transportation service; a carrier who uses the property may not, for the purpose of obtaining, for the transportation of the property from such point of origin to a point of intersection between its own line and the line of such other carrier, a rate which is less than the rate contemporaneously exacted from other shippers for the transportation of a like kind of property from said point of origin to said point of intersection, ship the property from such point of origin to a point of destination on its own line, under a through rate published and filed and made applicable to such transportation, and, when the property reaches its own line, either use the property at such point of intersection or transport it to a point on its

own line other than the point to which such through rate applies, and then pay for the transportation from such point of origin to said point of intersection, not the rate applicable to the transportation between those points, but the division of the through rate which goes to such other carrier, as aforesaid.   And if it does so it thereby subjects itself to the penalties provided for in the act and made applicable to cases of false billing and misrepresentation. *Wight* v. *United States, supra; Capital City Gas Co.* v. *Central Vermont Ry. Co.,* 11 I. C. C. Rep. 104.  See, also, *Matter of Contracts of Express Companies,* 16 I. C. C. Rep. 246; *Hitchman Coal & Coke Co.* v. *Baltimore & Ohio R. R. Co.,* 16 I. C. C. Rep. 512.

The Commerce Court erred in substituting its own judgment for that of the Commission concerning the character of the traffic, transportation services, discrimination and preference and prejudice involved.   *Int. Com. Comm.* v. *Delaware, L. & W. R. R. Co., supra.*   See, also, *Balto. & O. R. Co.* v. *Pitcairn,* 215 U. S. 481; *Southern Pacific Co.* v. *Int. Com. Comm.,* 219 U. S. 433.

The court erred in entering the interlocutory decree and granting the temporary injunction, without complying with the requirements of § 3 of the Commerce Court Act of June 18, 1910.

If the Commerce Court may, simply as a matter of discretion, for its own convenience, the convenience of carriers, or some other similar reason, enjoin temporarily enforcement of an order of the Commission, it may destroy, for all practical purposes, the power of the Commission and render impossible its regulations.

Under present conditions, there appears to be nothing for this court to do except to examine the entire record and determine whether the matters included therein justify the action taken by the Commerce Court.

A construction of the law which makes necessary such a method of procedure is not reasonable, because it in-

dicates that the Congress attempted to do something which is in excess of its power under the Constitution; that is, confer upon this court original jurisdiction in the premises. *Baltimore & Ohio R. R. Co.* v. *Int. Com. Comm.*, 215 U. S. 216; *Southern Pacific Co.* v. *Int. Com. Comm.*, 215 U. S. 226.

Congress neither intended to, nor could, confer upon the Commerce Court, or any other court, legislative discretion. *Int. Com. Comm.* v. *Illinois Cent. R. R. Co.*, 215 U. S. 452.

*Mr. Assistant Attorney General Denison*, with whom *Mr. Blackburn Esterline*, Special Assistant to the Attorney General, was on the brief, for the United States:

In its terms the order enjoined was directed exclusively against the restriction of rates to coal of certain consignors or consignees or for designated uses; and is directly within the principle laid down in *Int. Com. Comm.* v. *Delaware, L. & W. R. R.*, 220 U. S. 235; *New York, N. H. & H. R. R. Co.* v. *Int. Com. Comm.*, 200 U. S. 361, 391–395.

The illegality of a discrimination based exclusively on identity of the shipper or consignee, or on the intention with which the goods are shipped or received, or use to which they are put, is no longer open to argument.

The finality of the conclusion of the Commission under the circumstances of this case has been repeatedly announced by this court. 206 U. S. 466; 218 U. S. 110.

*Mr. W. Irvine Cross* and *Mr. Hugh L. Bond, Jr.*, for appellees:

The filing of tariffs in which the traffic in railroad fuel coal is treated as a separate traffic from the traffic in commercial coal between the same points is not a violation of § 2 of the Act to Regulate Commerce.

When Congress, in the commodities clause, wished to describe the only commodities that could be transported

by a railroad without any tariff at all, it described them, identified them, by the very language that the railroads have employed to identify the commodity carried in this traffic.

A special rate cannot be given to a particular consignee based simply on his personality, but a consignee may receive a special rate on a special kind of traffic. Neither can a special rate be given because of the use to which a commodity is to be put; but it would be a strange principle that a rate could not be influenced by the place where the commodity was to be used, or the transportation it must still undergo in reaching the point of use. A railroad, as distinguished from a railroad company, is not a person. It is rather in the nature of a geographical division, and extends through long distances. A railroad's use of coal for fuel is not different from the use of it by any other consumer of fuel. The service in delivering it at the junction point differs in the fact that the coal still has to be transported through long distances to secure its use at all.

The railroad fuel rates are open and available alike for all shippers, that is, for all shippers wishing to engage in the special traffic on which the rates are made. They are not restricted to certain shippers. They are not conditioned upon the commodities being put to a certain use. They are limited to a service where the commodity is subject to further transportation under the commodities clause, before reaching the point of use. The analogy in principle of the railroad-fuel traffic to the import traffic and the export traffic is complete.

The Commission's method of filing fuel coal rates is illegal under § 6 of the Interstate Commerce Act and Elkins Act. Congress never intended that the tariffs prescribed in § 6 should cover the transportation of the carrier's own property.

The Commerce Court had power to review on appeal

the construction put by the Commission on the Act to Regulate Commerce even though the subject-matter of the order was within the jurisdiction of the Commission and the order did not violate any constitutional right.

As to whether or not import traffic constitutes a like kind of traffic with domestic traffic between the same points, see *Import Rate Case*, 162 U. S. 197.

As to the right of the Commission to ignore circumstances and conditions in fixing rates, see *Louisville &c. R. R. Co.* v. *Behlmer*, 175 U. S. 648; *East Tennessee &c. Ry. Co.* v. *Int. Com. Comm.*, 181 U. S. 1; *Southern Ry. Co.* v. *St. Louis Hay Co.*, 214 U. S. 297; *Int. Com. Comm.* v. *Northern Pac. Ry. Co.*, 216 U. S. 538; *Int. Com. Comm.* v. *Delaware, L. & W. R. R. Co.*, 216 U. S. 531: 220 U. S. 235.

The question whether or not the Commission can refuse to consider the features of the fuel traffic, as making it an unlike traffic with the traffic in commercial coal, is a pure question of law, difficult to distinguish in principle from that which was decided in the *Import Rate Case*, *supra*.

Traffic in railroad fuel coal is different from the traffic in commercial coal within the meaning of the term "traffic" in § 2 of the Act to Regulate Commerce, and the service performed in transporting coal destined for the railroad fuel market is not a like service to that performed in transporting coal destined for the commercial market. The values of the services are commercially different and determined by different factors.

In the *Import Rate Case*, 162 U. S. 197, circumstances and conditions arising before the traffic was delivered by the consignor to the carrier for transportation at point of origin were recognized as creating an unlike kind of traffic. See, also, *Pittsburgh Plate Glass Co.* v. *O. C. C. & St. L. Co.*, 13 I. C. C. Rep. 100; *Kimble* v. *Boston & A. R. R. Co.*, 8 I. C. C. Rep. 110.

Mr. Justice McKenna, after stating the case as above, delivered the opinion of the court.

The case involves the consideration of §§ 2 and 3 of the Interstate Commerce Act. Section 2 provides that if any common carrier shall directly or indirectly charge or receive from any person or persons a greater or less compensation than it charges or receives from any other person or persons "for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of discrimination. . . ."

Section 3 is directed against giving preferences or advantages to persons, localities or descriptions of traffic in any respect whatsoever and subjecting any person, locality or traffic "to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The companies contend that the Commission applied these sections to the facts found by the Commission, none of them being disputed, and that, therefore, the findings of the Commission are conclusions of law. On the other hand, the Commission charges that its findings are those of fact and exclusively within its jurisdiction, and not open to review by the Commerce Court or any court. Many of its assignments of error are expressions of this view. The other assignments assert in various ways and with many shades of particularity that the Commerce Court erred in disagreeing with the Commission in regard to the traffics in the different coals, not only in its decision, as indicated in its injunction, in the matters affecting such traffic, but in substituting its judgment for that of the Commission.

The facts are certainly undisputed, or, to put it differently, the circumstances and conditions which determined the order are certainly not in controversy; and while certain general inferences are disputed which may be

called inferences of fact, yet we think "power to make the order, and not the mere expediency of having made it, is the question" presented. *Int. Com. Comm.* v. *Illinois Cent. R. R. Co.*, 215 U. S. 452, 470. In other words, that the question presented by the petition is that the order of the Commission was not merely administrative, but proceeded from a construction of §§ 2 and 3 as applicable to the conditions which affected the traffic in the different kinds of coal and that the different charges for transportation constituted violations of those sections. The Commerce Court, therefore, had jurisdiction of the petition and jurisdiction to enjoin the order of the Commission if the court considered that the order would cause irreparable injury. Section 3 of the act creating the Commerce Court gives that court the power to "enjoin, set aside, annul or suspend any order of the Interstate Commerce Commission, in a suit brought in the court against the United States." Whether the court erred in its judgment is now to be inquired into.

In its most abstract form the simple statement of the controversy is whether the companies may charge a different rate for the transportation of fuel coal to a given point than for the transportation of commercial coal to the same point. But when we depart from the abstract, complexities appear and attention is carried beyond the consideration of points equally distant, shippers equally circumstanced and traffic affected by similar circumstances and conditions. It is asserted that there are disparities between the traffics and qualifying circumstances which the Commission disregarded and, in error, held that traffic in fuel coal could not be distinguished from the traffic in commercial coal.

The Commission insists upon the simplicity of the problem and contends that there is nothing in the conditions of the traffic which dispenses with the clear legal duty of the companies under the Interstate Commerce Act to

carry for all shippers alike.   The Commission says: "We have never held that the local rate to the junction point must be paid on shipments that are going beyond that point.   What we have said is that the local rate to the junction point shall be the same for all shippers to that point, and that the through charges on shipments going beyond the junction point shall be alike for all shippers to the same destination."   Its position thus expressed the Commission has supplemented, we are told by the companies, by its Conference Ruling No. 324, published June 19, 1911, as follows: "Division on Company Coal.— Upon Inquiry, Held, That it is unlawful for carriers to make special and discriminatory divisions of joint rates upon locomotive fuel as between an originating or participating carrier and a purchasing carrier.   In the division of joint rates a railroad must be treated precisely as any other shipper is treated, and the Commission will regard any special division as a device to defeat the published rate.   All divisions upon fuel coal must be made in good faith without respect to the fact that one of the carriers is the purchaser of such coal.".

The issue of principle between the Commission and the companies is very accurately presented, and we come to consider whether there are differences in the traffic of fuel coal which distinguish it from traffic in commercial coal, and which, as contended by the companies, make the traffic dissimilar in circumstances and conditions, or whether the opposite is true, as decided by the Commission.

The circumstances and conditions which may so far be considered as distinguishing traffics so as to take from different transportation charges the vice of preference have been described by this court.   In *Wight* v. *United States*, 167 U. S. 512, 518, it is said: "It was the purpose of the section [2] to enforce equality between shippers, and it prohibits any rebate or other device by which two shippers, shipping over the same line, the same distance, under

the same circumstances of carriage, are compelled to pay different prices therefor." These words are given more precision by the declaration "that the phrase, 'under substantially similar circumstances and conditions,' as found in section 2, refers to matters of carriage, and does not include competition." And this was repeated in *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 161, 166. The facts in both cases give significance to the rulings. In the first case the charges to the shippers were the same, but one was given extra facilities; in the second case the extraneous effect of competition was excluded as an element in the application of the section. There is also example in *Interstate Commerce Commission* v. *Delaware, L. & W. R. R. Co.*, 220 U. S. 235. It was there held that a carrier could not look beyond goods tendered to it for transportation in carload lots "to the ownership of the shipment" as the basis for determining the application of its established rates. Do the circumstances and conditions in this case give a greater power of discrimination and justify the lower charge to railroad-fuel coal? It is admitted that the fact that a railroad is the shipper or consumer is not a circumstance or condition that affects the carriage, nor can the different uses to which the coal may be put, and it would seem necessarily that any other extraneous condition or circumstance could have no greater potency. Once depart from the clear directness of what relates to the carriage only and we may let in considerations which may become a cover for preferences. May a carrier look beyond the service it is called upon to render to the attitude and interest of the shippers before, or their attitude and interest after, transportation? It must be kept in mind that it is not the relation of one railroad to another with which we have any concern, but the relation of a railroad to its patrons, who are entitled to equality of charges. See *Pennsylvania R. R. Co.* v. *International Mining Co.*, 173 Fed. Rep. 1.

But what are the differences in the traffics which are asserted by the companies? We have already condensed them from the pleadings, but we may use the expression of their ultimate elements by the companies, omitting, for the time being, the physical differences in facilities. They say: "When the railroad-fuel coal is consigned to the junction point, as provided in the present system of tariffs, the circumstances and conditions that differentiate this traffic from the traffic in commercial coal consigned to the same point are:

"1. The fuel coal so shipped is not in competition with the commercial coal consigned to the same point.

"2. It is in competition with other coals coming upon the line of the consuming road at other points, with which the commercial coal is not in competition.

"3. The transportation service is different, in that commercial coal at the junction point has reached the point of use, while railroad-fuel coal reaching the consuming railroad at the junction point is still subject to a transportation service before reaching the point of use,—a transportation under the 'Commodities Clause' and not under tariff."

These elements the Commission disregarded, it is contended, and that while it found a similarity in the traffics it did not consider or discuss the two most important features of difference—"the two features" which make the traffics unlike, that is, that railroad-fuel coal "does not come into competition with the commercial coal, and is in competition with coals coming on the railroad's line at other points." But such features do not affect the carriage, qualify or alter the essential service, which is to get an article from one place to another. The greater or less inducement to seek the service is not the service. Such competition, therefore, is as extraneous to the transportation as the instances in the cases cited. And equally so is the other "feature" that the fuel coal may be destined for

consumption beyond the junction point. The circumstances do not alter the fact that it and commercial coal go to the same point, and are delivered at the same point. There is, it is true, a difference in the manner of delivery, depending upon the difference in the facilities possessed by the railroads and other consignees.

The Commission, as we have seen, especially disclaimed holding that the rate to the junction point must be paid on shipments going beyond that point, and insisted that it only held that the charges to that point should be the same to all shippers, and rates through that point should also be the same to all shippers. And the Commission said that the testimony established that the service as to the coals was alike when they go beyond the junction point. The Commission, therefore, considered alone the service, disregarding circumstances and conditions which were mere incidents of it and had relation only to the respective shippers.

But the companies say, in criticism of the reasoning and order of the Commission, they are permitted to do indirectly what they want to do directly, that an easy way of evasion of the prohibiting order is to make a joint rate from the point of origin of the fuel coal to its points of consumption, and thereby be enabled "to charge a lower rate for the fuel coal than for the commercial coal between the same points." And further, in display of the easiness with which this can be accomplished and "how readily the Commission's order lends itself to manipulation of rates," they say that they have only to publish a nominal delivery point beyond the real delivery point, publish a rate to that point which they do not intend to charge and call their actual rate to the junction point, based on the special circumstances and conditions, a "division." They then ask if "the Commission can so easily juggle a rate for a good purpose, will not ingenious traffic agents and coal operators do the same for their own perverse ends." If such a situa-

tion artfully produced be used as a device for giving preferences the Commission might be able to find some means to defeat it.    At present we must regard its possibility as relevant as exhibiting a misconception of the Commission's purpose.    The Commission has not said what the rate should be, nor has it said, as we have seen, that the local rate to the junction point should be the same as the rate beyond that point.    The Commission has ordered equality and struck down what it deemed to be preferential charges, even though they were made under formal tariffs.    If there may be legal or illegal evasion of the order, we may wonder at the controversy.    If the difference between the effect of the order and what the companies can do or want to do be, as is contended, a "question of words"—a "question of the nomenclature to be used in tariffs"—the order of the Commission may still be valid. Tariffs are but forms of words, and certainly the Commission, in the exercise of its powers to administer the Interstate Commerce Act, can look beyond the forms to what caused them and what they are intended to cause and do cause.

There are other contentions or rather phases of those that we have considered and which seek to further emphasize the strength of competition as a circumstance or condition differentiating the traffic.    For instance, it is urged that the shipment of the fuel coal to a particular railroad "for the use of that railroad" makes special the traffic.    And, further, that "a railroad is not a person" but is "rather in the nature of a geographical division and extends through long distances."    Pushing the argument or illustrations farther, it is urged that a railroad company may be distinguished from the physical thing, the railroad itself, and may be a locality where a commodity is used, like "a river, a county or a city," and be entitled to preferential rates to accommodate competitive conditions. The *Import Rate Case*, 162 U. S. 197, is invoked as anal-

ogous. We cannot accept the likeness nor the distinctions which are said to establish it. The railroad company cannot be put out of view as a favored shipper, and we see many differences between such a shipper receiving coal for use in its locomotives and a nation as the destination of goods from other nations for distribution throughout its expanse on through rates from points of origin.

The point is made that "the Commission's method of filing fuel coal rates is illegal under section 6 of the Interstate Commerce Act and under the Elkins Act," and the latter act and § 6 are quoted in illustration. The rather vague argument which is urged to support the point lands in the proposition that the right to violate the law as to preference in rates is justified by the law in its requirement of the filing of schedules of rates. However, counsel say that "it all goes back to the same principle" "dealt with under point 1." We have sufficiently discussed point 1.

*The decree of the Commerce Court is reversed and the case remanded with direction to dismiss the petition.*