225 U.S. 326 (1912)
INTERSTATE COMMERCE COMMISSION AND THE UNITED STATES
v.
BALTIMORE AND OHIO RAILROAD COMPANY, PENNSYLVANIA RAILROAD COMPANY ET AL.
No. 719.
Supreme Court of United States.
Argued January 12, 15, 1912.
Decided June 7, 1912.
APPEAL FROM THE UNITED STATES COMMERCE COURT.
*333 Mr. P.J. Farrell for the Interstate Commerce Commission.
Mr. W. Irvine Cross and Mr. Hugh L. Bond, Jr., for appellees.
*339 MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.
The case involves the consideration of §§ 2 and 3 of the Interstate Commerce Act. Section 2 provides that if any common carrier shall directly or indirectly charge or receive from any person or persons a greater or less compensation than it charges or receives from any other person or persons "for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of discrimination. . . ."
Section 3 is directed against giving preferences or advantages to persons, localities or descriptions of traffic in any respect whatsoever and subjecting any person, locality or traffic "to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."
The companies contend that the Commission applied these sections to the facts found by the Commission, none of them being disputed, and that, therefore, the findings of the Commission are conclusions of law. On the other hand, the Commission charges that its findings are those of fact and exclusively within its jurisdiction, and not open to review by the Commerce Court or any court. Many of its assignments of error are expressions of this view. The other assignments assert in various ways and with many shades of particularity that the Commerce Court erred in disagreeing with the Commission in regard to the traffics in the different coals, not only in its decision, as indicated in its injunction, in the matters affecting such traffic, but in substituting its judgment for that of the Commission.
The facts are certainly undisputed, or, to put it differently, the circumstances and conditions which determined the order are certainly not in controversy; and while certain general inferences are disputed which may be *340 called inferences of fact, yet we think "power to make the order, and not the mere expediency of having made it, is the question" presented. Int. Com. Comm. v. Illinois Cent. R.R. Co., 215 U.S. 452, 470. In other words, that the question presented by the petition is that the order of the Commission was not merely administrative, but proceeded from a construction of §§ 2 and 3 as applicable to the conditions which affected the traffic in the different kinds of coal and that the different charges for transportation constituted violations of those sections. The Commerce Court, therefore, had jurisdiction of the petition and jurisdiction to enjoin the order of the Commission if the court considered that the order would cause irreparable injury. Section 3 of the act creating the Commerce Court gives that court the power to "enjoin, set aside, annul or suspend any order of the Interstate Commerce Commission, in a suit brought in the court against the United States." Whether the court erred in its judgment is now to be inquired into.
In its most abstract form the simple statement of the controversy is whether the companies may charge a different rate for the transportation of fuel coal to a given point than for the transportation of commercial coal to the same point. But when we depart from the abstract, complexities appear and attention is carried beyond the consideration of points equally distant, shippers equally circumstances and traffic affected by similar circumstances and conditions. It is asserted that there are disparities between the traffics and qualifying circumstances which the Commission disregarded and, in error, held that traffic in fuel coal could not be distinguished from the traffic in commercial coal.
The Commission insists upon the simplicity of the problem and contends that there is nothing in the conditions of the traffic which dispenses with the clear legal duty of the companies under the Interstate Commerce Act to *341 carry for all shippers alike. The Commission says: "We have never held that the local rate to the junction point must be paid on shipments that are going beyond that point. What we have said is that the local rate to the junction point shall be the same for all shippers to that point, and that the through charges on shipments going beyond the junction point shall be alike for all shippers to the same destination." Its position thus expressed the Commission has supplemented, we are told by the companies, by its Conference Ruling No. 324, published June 19, 1911, as follows: "Division on Company Coal.  Upon Inquiry, Held, That it is unlawful for carriers to make special and discriminatory divisions of joint rates upon locomotive fuel as between an originating or participating carrier and a purchasing carrier. In the division of joint rates a railroad must be treated precisely as any other shipper is treated, and the Commission will regard any special division as a device to defeat the published rate. All divisions upon fuel coal must be made in good faith without respect to the fact that one of the carriers is the purchaser of such coal."
The issue of principle between the Commission and the companies is very accurately presented, and we come to consider whether there are differences in the traffic of fuel coal which distinguish it from traffic in commercial coal, and which, as contended by the companies, make the traffic dissimilar in circumstances and conditions, or whether the opposite is true, as decided by the Commission.
The circumstances and conditions which may so far be considered as distinguishing traffics so as to take from different transportation charges the vice of preference have been described by this court. In Wight v. United States, 167 U.S. 512, 518, it is said: "It was the purpose of the section [2] to enforce equality between shippers, and it prohibits any rebate or other device by which two shippers, shipping over the same line, the same distance, under *342 the same circumstances of carriage, are compelled to pay different prices therefor." These words are given more precision by the declaration "that the phrase, `under substantially similar circumstances and conditions,' as found in section 2, refers to matters of carriage, and does not include competition." And this was repeated in Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U.S. 144, 161, 166. The facts in both cases give significance to the rulings. In the first case the charges to the shippers were the same, but one was given extra facilities; in the second case the extraneous effect of competition was excluded as an element in the application of the section. There is also example in Interstate Commerce Commission v. Delaware, L. & W.R.R. Co., 220 U.S. 235. It was there held that a carrier could not look beyond goods tendered to it for transportation in carload lots "to the ownership of the shipment" as the basis for determining the application of its established rates. Do the circumstances and conditions in this case give a greater power of discrimination and justify the lower charge to railroad-fuel coal? It is admitted that the fact that a railroad is the shipper or consumer is not a circumstance or condition that affects the carriage, nor can the different uses to which the coal may be put, and it would seem necessarily that any other extraneous condition or circumstance could have no greater potency. Once depart from the clear directness of what relates to the carriage only and we may let in considerations which may become a cover for preferences. May a carrier look beyond the service it is called upon to render to the attitude and interest of the shippers before, or their attitude and interest after, transportation? It must be kept in mind that it is not the relation of one railroad to another with which we have any concern, but the relation of a railroad to its patrons, who are entitled to equality of charges. See Pennsylvania R.R. Co. v. International Mining Co., 173 Fed. Rep. 1.
*343 But what are the differences in the traffics which are asserted by the companies? We have already condensed them from the pleadings, but we may use the expression of their ultimate elements by the companies, omitting, for the time being, the physical differences in facilities. They say: "When the railroad-fuel coal is consigned to the junction point, as provided in the present system of tariffs, the circumstances and conditions that differentiate this traffic from the traffic in commercial coal consigned to the same point are:
"1. The fuel coal so shipped is not in competition with the commercial coal consigned to the same point.
"2. It is in competition with other coals coming upon the line of the consuming road at other points, with which the commercial coal is not in competition.
"3. The transportation service is different, in that commercial coal at the junction point has reached the point of use, while railroad-fuel coal reaching the consuming railroad at the junction point is still subject to a transportation service before reaching the point of use,  a transportation under the `Commodities Clause' and not under tariff."
These elements the Commission disregarded, it is contended, and that while it found a similarity in the traffics it did not consider or discuss the two most important features of difference  "the two features" which make the traffics unlike, that is, that railroad-fuel coal "does not come into competition with the commercial coal, and is in competition with coals coming on the railroad's line at other points." But such features do not affect the carriage, qualify or alter the essential service, which is to get an article from one place to another. The greater or less inducement to seek the service is not the service. Such competition, therefore, is as extraneous to the transportation as the instances in the cases cited. And equally so is the other "feature" that the fuel coal may be destined for *344 consumption beyond the junction point. The circumstances do not alter the fact that it and commercial coal go to the same point, and are delivered at the same point. There is, it is true, a difference in the manner of delivery, depending upon the difference in the facilities possessed by the railroads and other consignees.
The Commission, as we have seen, especially disclaimed holding that the rate to the junction point must be paid on shipments going beyond that point, and insisted that it only held that the charges to that point should be the same to all shippers, and rates through that point should also be the same to all shippers. And the Commission said that the testimony established that the service as to the coals was alike when they go beyond the junction point. The Commission, therefore, considered alone the service, disregarding circumstances and conditions which were mere incidents of it and had relation only to the respective shippers.
But the companies say, in criticism of the reasoning and order of the Commission, they are permitted to do indirectly what they want to do directly, that an easy way of evasion of the prohibiting order is to make a joint rate from the point of origin of the fuel coal to its points of consumption, and thereby be enabled "to charge a lower rate for the fuel coal than for the commercial coal between the same points." And further, in display of the easiness with which this can be accomplished and "how readily the Commission's order lends itself to manipulation of rates," they say that they have only to publish a nominal delivery point beyond the real delivery point, publish a rate to that point which they do not intend to charge and call their actual rate to the junction point, based on the special circumstances and conditions, a "division." They then ask if "the Commission can so easily juggle a rate for a good purpose, will not ingenious traffic agents and coal operators do the same for their own perverse ends." If such a situation *345 artfully produced be used as a device for giving preferences the Commission might be able to find some means to defeat it. At present we must regard its possibility as relevant as exhibiting a misconception of the Commission's purpose. The Commission has not said what the rate should be, nor has it said, as we have seen, that the local rate to the junction point should be the same as the rate beyond that point. The Commission has ordered equality and struck down what it deemed to be preferential charges, even though they were made under formal tariffs. If there may be legal or illegal evasion of the order, we may wonder at the controversy. If the difference between the effect of the order and what the companies can do or want to do be, as is contended, a "question of words"  a "question of the nomenclature to be used in tariffs"  the order of the Commission may still be valid. Tariffs are but forms of words, and certainly the Commission, in the exercise of its powers to administer the Interstate Commerce Act, can look beyond the forms to what caused them and what they are intended to cause and do cause.
There are other contentions or rather phases of those that we have considered and which seek to further emphasize the strength of competition as a circumstance or condition differentiating the traffic. For instance, it is urged that the shipment of the fuel coal to a particular railroad "for the use of that railroad" makes special the traffic. And, further, that "a railroad is not a person" but is "rather in the nature of a geographical division and extends through long distances." Pushing the argument or illustrations farther, it is urged that a railroad company may be distinguished from the physical thing, the railroad itself, and may be a locality where a commodity is used, like "a river, a county or a city," and be entitled to preferential rates to accommodate competitive conditions. The Import Rate Case, 162 U.S. 197, is invoked as analogous. *346 We cannot accept the likeness nor the distinctions which are said to establish it. The railroad company cannot be put out of view as a favored shipper, and we see many differences between such a shipper receiving coal for use in its locomotives and a nation as the destination of goods from other nations for distribution throughout its expanse on through rates from points of origin.
The point is made that "the Commission's method of filing fuel coal rates is illegal under section 6 of the Interstate Commerce Act and under the Elkins Act," and the latter act and § 6 are quoted in illustration. The rather vague argument which is urged to support the point lands in the proposition that the right to violate the law as to preference in rates is justified by the law in its requirement of the filing of schedules of rates. However, counsel say that "it all goes back to the same principle" "dealt with under point 1." We have sufficiently discussed point 1.
The decree of the Commerce Court is reversed and the case remanded with direction to dismiss the petition.