304 F.2d 938
 ROYAL NETHERLANDS STEAMSHIP COMPANY, Petitioner,
v.
FEDERAL MARITIME BOARD (now Federal Maritime Commission) and United States of America, Respondents, Lykes Bros. Steamship Co., Inc., Intervenor.
LYKES BROS. STEAMSHIP CO., Inc., Petitioner,
v.
FEDERAL MARITIME BOARD (now Federal Maritime Commission) and United States of America, Respondents.
HOUSTON FREIGHT FORWARDING COMPANY, Inc., Petitioner,
v.
FEDERAL MARITIME BOARD (now Federal Maritime Commission) and United States of America, Respondents.
BARTLETT-COLLINS COMPANY, Petitioner,
v.
FEDERAL MARITIME BOARD (now Federal Maritime Commission) and United States of America, Respondents.
 No. 16093.
 No. 16154.
 No. 16173.
 No. 16224.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 20, 1962.
 Decided June 7, 1962.
 
 Mr. Norman M. Barron, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. John D. Fitzgerald and Donald M. Sullivan, Washington, D. C., were on the brief, for petitioner in No. 16093.
 Mr. M. L. Cook, Houston, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. Odell Kominers, Washington, D. C., was on the brief, for petitioner in No. 16154. Mr. Harrison D. Hutson, Washington, D. C., also entered an appearance for petitioner in No. 16154.
 Mr. Richard H. Powell, Houston, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. Arthur E. Tarantino, Washington, D. C., was on the brief, for petitioner in No. 16173.
 Mr. Karl H. Mueller, Fort Worth, Tex., for petitioner in No. 16224.
 Mr. Thomas D. Wilcox, Atty., Federal Maritime Commission, with whom Messrs. James L. Pimper, Gen. Counsel, and Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, and Richard A. Solomon, Atty., Dept. of Justice, were on the brief for respondents. Mr. Edward Aptaker, Asst. Gen. Counsel, Federal Maritime Commission, at the time the record was filed, also entered an appearance for respondent, Federal Maritime Commission.
 Before WILBUR K. MILLER, Chief Judge, and WASHINGTON and DANAHER, Circuit Judges.
 WILBUR K. MILLER, Chief Judge.
 
 
 1
 Bartlett-Collins Company of Sapulpa, Oklahoma, manufactures glassware products which it sells in domestic and foreign markets. Late in 1955 Bartlett-Collins began making shipments to Venezuelan customers from the Texas ports of Houston and Galveston. It engaged Houston Freight Forwarding Company to arrange the ocean transportation. In the period between the inception of this practice and June, 1956, the freight forwarder handled for Bartlett-Collins approximately 240 shipments of glassware to Venezuela, which were transported from a Texas port by Lykes Bros. Steamship Co., Royal Netherlands Steamship Company and Compania Anonima Venezolana de Navegacion, three common carriers by water.
 
 
 2
 On September 20, 1956, the Federal Maritime Board[1] ordered an investigation to determine whether Bartlett-Collins, Freight Forwarding and the three ocean carriers had, during the period involved, violated Section 16 of the Shipping Act of 1916, as amended, 49 Stat. 1518, 46 U.S.C.A. § 815 (1958).[2] The inquiry was to ascertain whether, by using a false classification or any other unjust or unfair device or means, Bartlett-Collins and Freight Forwarding had obtained, or had attempted to obtain, ocean transportation at less than the applicable rates; and to determine whether Lykes Bros., Royal Netherlands or the Venezuelan steamship company had "allowed" Bartlett-Collins and Freight Forwarding to obtain transportation of shipments at unauthorized low rates.[3]
 
 
 3
 An Examiner of the Board conducted extensive hearings and filed a recommended decision on November 17, 1959, in which he said the Board should find (a) that Freight Forwarding had knowingly and willfully violated Section 16 by "misclassifying shipments of glass tumblers and other glassware items as empty jars," and that Bartlett-Collins had violated the Section by authorizing the misclassification; and (b) that the proceeding should be dismissed as to the respondent carriers because there was no evidence they had "allowed" Freight Forwarding and Bartlett-Collins to obtain transportation at less than the regular rates by means of false classification or other unjust or unfair device.
 
 
 4
 On November 21, 1960, the Board filed a report adopting the Examiner's recommendation that Bartlett-Collins and Freight Forwarding be found to have violated Section 16, but rejecting his recommendation that the proceeding be dismissed as to the ocean carriers. It found that Lykes Bros., Royal Netherlands and the Venezuelan line had also violated Section 16. The Board's report concluded with the statement that "The matter will be referred to the Department of Justice."
 
 
 5
 Attached to its report was the Board's order, also dated November 21, 1960, directing Freight Forwarding, Lykes Bros., Royal Netherlands and the Venezuelan carrier to abstain from the practices it had found to be unlawful and to report concerning compliance with the directives. It was also ordered that "The proceeding be and it is hereby discontinued." Lykes Bros., Royal Netherlands and Freight Forwarding have separately petitioned for review.
 
 
 6
 It will be observed that Bartlett-Collins was not mentioned in the order of November 21, 1960. A separate but similar order was served on it December 23, 1960. Bartlett-Collins has petitioned for review on the ground that the proceeding had been discontinued before the order against it was entered, and on the further ground that the record does not support the order. Before discussing the merits, we consider Bartlett-Collins' theory that discontinuance of the proceeding ordered on November 21, 1960, made the subsequent order against it invalid. We observe that the Board said in its report, "For the reasons hereinafter noted, we find that all of the respondents violated Sec. 16 of the Act." The omission of Bartlett-Collins from the original order was therefore plainly due to inadvertence. We think the Board had the power to issue the subsequent order.
 
 
 7
 A description of the manner by which Bartlett-Collins and Freight Forwarding prepared foreign shipments for presentation to ocean carriers is essential to an understanding of these cases. When Bartlett-Collins prepared a shipment for a foreign customer, its loading department in Sapulpa described the various articles on a loading tally and from it prepared an inland bill of lading for shipment by truck to the port of departure. The two documents then were sent to Freight Forwarding, which prepared an ocean bill of lading and export declaration, based on the loading tally and inland bill of lading, or upon oral advice received from Bartlett-Collins. These papers were delivered to the ocean carrier, and a copy of the ocean bill of lading and a statement of charges with respect to it were sent by Freight Forwarding to Bartlett-Collins. The ocean carrier filed each export declaration with the Collector of Customs. This, in brief, was the procedure followed as to each shipment.
 
 
 8
 The applicable tariffs contained rates for three kinds of glassware: "Tumblers," "Bottles or Jars" and "Glassware N.O.S." (Not otherwise specified). The rate for jars was a stated sum per ton. Tumblers (table glassware) took a higher rate based on cubic contents. Glassware N.O.S. took a still higher rate. Simply stated, the Board found violations of Section 16 because Bartlett-Collins had shipped as "empty glass jars" many items of glassware which were not in fact empty glass jars but were various other glass products subject to higher rates.
 
 
 9
 Forty-four of the many shipments made by Bartlett-Collins during the period in question were selected at random and examined in detail during the hearings. It appeared that Bartlett-Collins had shipped more than 7,700 cartons of drinking glasses which it argues were correctly classified as jars instead of tumblers because it was informed that its customers intended to use them as packaging containers for food products and other articles. The Supreme Court indicated in Interstate Commerce Commission v. Baltimore & O. R. Co., 225 U. S. 326, 342, 32 S.Ct. 742, 56 L.Ed. 1107 (1912), that a different use does not change the character of an article and is not a lawful basis for a difference in freight charges. In that case the railroad company argued it could legally charge lower rates for carrying locomotive fuel for another railroad than those established for the transportation of commercial coal. The Court said, at page 342, 32 S.Ct. at page 746:
 
 
 10
 "* * * It is admitted that the fact that a railroad is the shipper or consumer is not a circumstance or condition that affects the carriage, nor can the different uses to which the coal may be put, and it would seem necessarily that any other extraneous condition or circumstance could have no greater potency. * * *" (Emphasis supplied.)
 
 
 11
 The "controlling use" of an article determines the classification under a tariff. Continental Can Co. v. United States, 272 F.2d 312, 315 (2nd Cir.1959). In that case, the Federal Maritime Board held that "packer's tumblers" which had been shipped as "empty jars" should have been classified as "tumblers," and that Section 16 had been violated. Continental sold, and its customers purchased, "packer's tumblers" for packaging purposes under a special price list which described them as such. The Second Circuit set aside the Board's order because it appeared that the "controlling use" of "packer's tumblers" was as containers for packaging.
 
 
 12
 The present case is distinguishable. Bartlett-Collins did not list the articles as "packer's tumblers" in its catalogue, and did not identify any Venezuelan consignee as a packer. Its contention was that the mere possibility that tumblers might be capped and used as jars or packer's tumblers should control the tariff classification. Moreover, the catalogue and loading tally descriptions were not followed in preparing the ocean bills of lading. These facts seem to us to justify the Board's inference that Bartlett-Collins and Freight Forwarding had falsely classified the shipments in order to obtain a more favorable ocean freight rate.
 
 
 13
 Be that as it may, however, it was shown that on the ocean bills of lading Freight Forwarding had classified as "empty glass jars" or "glassware jugs" the following articles: nappies (round serving dishes), jugs (pitchers), stemware, cookie jars, sherbet glasses, ashtrays, beverage sets, table glassware, decanter sets, juice extractors, flower bowls, sugar bowls and cream pitchers. In these instances, false classification seems obvious.
 
 
 14
 Section 16 is violated only if the false classification was "knowingly and willfully" made. The Supreme Court discussed these words in United States v. Illinois Central R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938). The Government alleged the railroad company knowingly annd willfully confined cattle in a car for 37 hours without unloading them, and sought to recover the penalty therefor which was provided by the statute prohibiting such confinement. The railroad company said its yardmaster negligently failed to notify the employees whose duty it was to unload and argued that, therefore, it had not "knowingly and willfully" confined the cattle so long. The Court said, at pages 242-243, 58 S.Ct. at pages 534, 535:
 
 
 15
 "Mere omission with knowledge of the facts [i. e. knowingly] is not enough. The penalty may not be recovered unless the carrier is also shown `willfully' to have failed. In statutes denouncing offenses involving turpitude, `willfully' is generally used to mean with evil purpose, criminal intent or the like. But in those denouncing acts not in themselves wrong, the word is often used without any such implication. * * * [I]t often denotes that which is `intentional, or knowing, or voluntary, as distinguished from accidental,' and that it is employed to characterize `conduct marked by careless disregard whether or not one has the right so to act.' * * *"
 
 
 16
 We conclude the Board correctly held that Bartlett-Collins and Freight Forwarding had violated Section 16 of the Act.
 
 
 17
 With respect to the ocean carriers, we reach a different conclusion. We quote the following from the Board's recital of the facts:
 
 
 18
 "There is no evidence that any of the glassware items shipped were ever shown to officials of the carriers to obtain a decision as to the proper tariff rating. Employees of the forwarder only made verbal inquiries to the carriers' employees as to the rate on `jars' or `tumblers.' The carriers did not have and were not informed what the inland bills of lading or the tally sheets showed, but they did have the export declarations. The variances between the bills of lading descriptions and export declaration descriptions of the same property was not noticed because the declaration does not always accompany the bill of lading and they were not always brought together and compared. The carriers relied on the shippers' description of the property in validating bills of lading and in allowing the shippers to obtain transportation for the property at the established tariff rate No. 7 item 115."
 
 
 19
 Having so found, the Board nevertheless decided the carrier had violated Section 16. It said, inter alia:
 
 
 20
 "* * * The carriers' intent to avoid their duty is inferred from their refusal to rely on their own processes of discovery and on their own personnel, and from their placing complete reliance on shippers or forwarders who have an incentive to conceal. This constitutes a willful and knowing means to avoid discovery of the truth, which is an unjust and unfair means."
 
 
 21
 Thus, the Board said the fact that the carriers did not utilize "their own processes of discovery" to determine whether the bills of lading properly described the shipments showed they purposely avoided discovery of the truth; from this premise, the Board inferred knowing and willful violations of Section 16 by the carrier.
 
 
 22
 The inference was unsupported and unwarranted. We do not find in this record evidence sufficient to justify the Board's rejection of the Examiner's recommendation with respect to the ocean carriers. The latter are not shown to have had anything like adequate notice that the shipper and freight forwarder had made false and improper classifications; we hold, therefore, that as to them the proceeding should have been dismissed.
 
 
 23
 Nos. 16,173 and 16,224 affirmed.
 
 
 24
 Nos. 16,093 and 16,154 reversed.
 
 
 
 Notes:
 
 
 [1]
 It was not until August 12, 1961, that Reorganization Plan No. 7 of 1961, 26 Fed.Reg. 7315, abolished the Federal Maritime Board and created in its stead the Federal Maritime Commission
 
 
 [2]
 The pertinent portion of Section 16 is as follows:
 "Sec. 16. That it shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable.
 "That it shall be unlawful for any common carrier by water, or other person subject to this Act, either alone or in conjunction with any other person, directly or indirectly —
 * * * * *
 "Second. To allow any person to obtain transportation for property at less than the regular rates or charges then established and enforced on the line of such carrier by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means."
 
 
 [3]
 During the period under investigation, ocean freight rates to Venezuela were fixed by Tariff 6 and later Tariff 7 of the United States Atlantic & Gulf-Venezuela and Netherlands Antilles Conference. Lykes Bros. and Royal Netherlands were members of the Conference, and the Venezuelan line concurred in the tariffs