**MIDLAND VALLEY R. CO. v. EXCELSIOR COAL CO.**

**No. 10551.**

Circuit Court of Appeals, Eighth Circuit.

Oct. 28, 1936.

Rehearing Denied Nov. 17, 1936.

O. E. Swan, of Muskogee, Okl., for appellant.

E. H. Bost, of Ft. Smith, Ark. (Eades & Rowe, of Greenwood, Ark., on the brief), for appellee.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The Midland Valley Railroad Company prosecutes this appeal to reverse a judgment rendered against it in a law action brought under section 16 of the Interstate Commerce Act (49 U.S.C.A. § 16) to enforce an award of reparation in the sum of $2,000 made by the Interstate Commerce Commission.

It appears that six coal miners engaged as partners under the name of Excelsior Coal Company in operating a coal mine which was located about 1,500 feet away from the railroad station at Excelsior, Ark. They operated the mine without a tipple and were dependent on loading the coal they mined into railroad cars by means of wagons. They started work in October of 1926, but at that time the railroad company had no suitable station or team track for wagon loading close to its station at Excelsior and they used the loading track at another mine until such use was denied them. No loading track was provided at the Excelsior station until February, 1929, when a three-car track was made ready for use in compliance with an order of the Arkansas Railroad Commission. Then the railroad company refused to comply with requests to furnish open-top cars for wagon loading of coal on the station track, taking the position that the furnishing of such cars for such purpose at such a place was contrary to the policy of the railroad company. In June, 1929, the six miners filed their complaint with the Interstate Commerce Commission, styling themselves partners doing business in the name of the Excelsior Coal Company. They allege that the refusal of the railroad company to furnish them open-top cars for wagon loading on the station track was unjust and unlawful and in violation of sections 1, 2, and 3 of the Interstate Commerce Act (49 U.S.C.A. §§ 1–3), and they prayed an order requiring the railroad company to cease and desist from its refusal and also for an award of damages in a large amount by way of reparation. After testimony had been taken and reported by an Examiner and after a hearing had been had the Commission found that "the requests of complainants on and after February 28, 1929, for open-top cars to be furnished on the station track at Excelsior for loading of coal to be transported in interstate commerce were reasonable and the refusal of defendant to furnish such cars after such date was * * * and for the future would be unjust, unreasonable and unduly prejudicial * * * during the periods when sufficient open-top cars are available and at the same time supply the requirements of tipple mines dependent upon it for" such cars. It was also held that "there can be no doubt that complainants were damaged as a result of the unreasonable and unlawful refusal of the defendant to furnish the cars," but because complainants' evidence as to the extent of the damages was "open to criticism in several respects" the case was held open to permit the filing of a petition for further hearing with respect to the amount of damage sustained. Such a petition was filed and a further hearing had. On further hearing the Examiner reported to the Com-

mission that it was impossible from the evidence before the Commission to reach any conclusion as to the fact or the amount of damages. He said: "There is of record no satisfactory evidence as to the market for coal, the return which could have been realized by complainants from coal produced, the cost of producing the coal at the mine, or the amount of coal which could have been produced." Exceptions were filed to the report of the Examiner and upon hearing the Commission reached a contrary conclusion. It found that: "From all the evidence it is safe to conclude that the cost of production (of coal during the reparation period) including the cost of hauling and loading, would not have exceeded 81 cents per ton." It considered the testimony tending to show that $2.50 per ton could have been realized from sales in interstate commerce and found that 1185 tons "represented the minimum tonnage" which the six miners might "reasonably be expected to have shipped in interstate commerce during the reparation period if the cars had been furnished."

The Commission found, upon consideration of all the evidence at both the original and further hearings, that by reason of defendant's refusal to furnish open-top cars upon reasonable requests by complainants for the interstate shipment of coal from Excelsior during the period from February 28, 1929, to and including February 28, 1930, the complainants were damaged in the sum of $2,000 and were entitled to reparation in that amount, with interest from March 1, 1930, and the reparations award was entered accordingly.

The railroad company having refused to pay the award, one of the six miners assigned all of his interest therein to the other five and they brought this suit in the name of the partnership, designating themselves "a firm doing business under the trade name of Excelsior Coal Company." The railroad company filed a general demurrer to the complaint, but, without obtaining any ruling thereon, answered, alleging that the orders of the Interstate Commerce Commission set out in the petition were made without jurisdiction and without any evidence to support them and in disregard of the evidence submitted to and considered by the Commission, and so were arbitrary and void, and it denied that reasonable demand had been made upon it by plaintiffs to furnish open-top cars or that it had refused, in disregard of its duty, to furnish open-top cars on its side track; wherefore, it prayed dismissal of the complaint.

The case was tried to the court upon the testimony which had been submitted to and considered by the Interstate Commerce Commission and some additional testimony, and the trial court made complete findings of fact and conclusions of law and entered judgment for the amount of the award with interest and an attorney's fee in the sum of $1,000.

The fact that one of the partners, Sam Adams, had, prior to the commencement of the suit, made a written assignment of his interest in the reparations award to his five partners was not set forth in the petition filed in the district court. The opening paragraph of that petition reads: "Comes the plaintiff, Excelsior Coal Company, a partnership composed of Tom Williams, Charles Hile, J. S. Adams, George Quillman and Sandy Cavalena, and for their cause of action against the defendant, Midland Valley Railroad Company, state:" And the petition is signed by each of the five named men. But before final submission of the case to the court Sam Adams was called as a witness and testified that he was one of the partners of Excelsior Coal Company and that he had made the written assignment of his interest and the same was received in evidence and is incorporated in the bill of exceptions. There is a stipulation that the other members of the partnership would have given the same testimony as to the assignment.

Undoubtedly the fact of the assignment should have been alleged in the petition, and when the proof of the assignment was made and received in evidence, an amendment to conform to such proof should have been noted upon the petition, as without such amendment some variance results between the proof and the court's findings thereon and the quoted allegations of the petition.

But it is clear that the variance was in no wise prejudicial to any right of the defendant railroad company. All of the persons who had any interest in the award of reparations sued upon were before the court and there is nothing to suggest that the judgment against the railroad company was rendered in favor of any wrong parties. The variance is a technical defect merely, within the meaning of 28 U.S.C.A. § 391, "which [does] not affect the substantial rights of the parties." Apparently the trial court proceeded

as though an amendment of the petition had been made to conform to the proof and in such situation this court may also consider the petition amended to conform to the proven facts. Norton v. Larney, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413.

■ It is claimed for the railroad company as a matter of substance, however, that more than a year elapsed between the effective date of the award of reparations and the time when the proof of the assignment was made on the trial of the case. The argument is that there was a new or different cause of action from the one sued on and that the new cause of action was too late under 49 U.S.C.A. § 16,. par. (3) (f).[1]

We think it clear that there was no new cause of action, but only a more complete presentation of the same cause which the plaintiffs intended to state in their petition. Counsel for plaintiffs stated, when the assignment was offered: "That they believe that this assignment should be included and made a part of the record in this case in this court, as it discloses that plaintiffs are the owners of the judgment, which they are seeking to recover herein. That the delay in making or asking that this assignment be made a part of the record in this court, has been unavoidable."

The situation properly called for an amendment to be made. 28 U.S.C.A. § 777. The claim that there was a new cause of action or that the action was barred is not sustained.

The railroad company does not contend that the interest of the partner Sam Adams in the reparations award was not assignable or that it was not properly assigned [Spiller v. Atchison, T. & S. F. Ry. Co., 253 U.S. 117, 40 S.Ct. 466, 64 L.Ed. 810; Marthens v. Pennsylvania R. Co. (C.C.A.) 78 F.(2d) 37], but in its brief it seeks to take advantage of the defect in the record under its contention that there was a defect of parties plaintiff apparent on the face of the petition and fatal to recovery. It presents that in the complaint the name of the plaintiff is "Excelsior Coal Company"; that Excelsior Coal Company is the plaintiff in the suit; that in the summons served on defendant the names of the partners do not appear, only "Excelsior Coal Company, plaintiff"; and that, al-though it is stated in the body of the complaint that Excelsior Coal Company is a partnership composed of individuals, they are not made parties. It asserts that under the law of Arkansas "a suit to enforce a partnership claim cannot be maintained in the firm name" but that "the suit must be by the partners, and all of the partners are necessary parties." "It (the petition) is fatally defective because one of the partners, Sam Adams, is not named." "Therefore, this suit cannot be maintained and the complaint is fatally defective because it shows on its face, with the exhibits thereto attached, that this is a suit to enforce a partnership claim brought in the firm name and without making all of the partners parties."

■ The contention of the appellant cannot be sustained. Section 1189, Crawford & Moses' Digest, governing procedure in civil actions in Arkansas, specifies that "the defendant may demur to the complaint where it appears on its face, either: * * * Second. That the plaintiff has not legal capacity to sue; * * * or Fourth. That there is a defect of parties, plaintiff or defendant." Section 1192 Crawford & Moses' Digest provides that where no such objection is taken defects appearing on the face of the complaint are waived except as to the lack of jurisdiction over the subject matter and insufficiency of the cause of action. As the defendant answered to the petition without having specially demurred on the ground of defect of parties plaintiff and without pleading such defect as a defense, it must be deemed to have waived the defect, if there was one. Tomlinson Chair Mfg. Co. v. Jop-Pa Mattress Co., 122 Ark. 566, 184 S.W. 32; Fitzhugh et al. v. First Nat. Bank of Batesville, 177 Ark. 328, 6 S.W. (2d) 308; Tootle et al. v. Coleman et al. (C.C.A.8) 107 F. 41, 57 L.R.A. 120; Mexican Gulf Oil Co. et al. v. Compania Transcontinental De Petroleo, S.A.(D.C.) 281 F. 148; Jutila v. Frye (C.C.A.9) 8 F.(2d) 608, 609; Hanna v. Brictson Mfg. Co. (C.C.A. 8) 62 F.(2d) 139; Agricultural Extension Club v. M. Hirsch & Son, 39 Cal.App. 433, 179 P. 430.

■ The petition contains no allegations (1) that the plaintiffs sustained damages as a result of the railroad's refusal to furnish cars; (2) that the reparations order of the

---

[1] "(f) A petition for the enforcement of an order of the commission for the payment of money shall be filed in the dis-trict court or the State court within one year from the date of the order, and not after."

Commission was served upon the railroad company; (3) or, that the railroad company had failed or refused to comply with the reparations order. The allegations of the petition were that the plaintiffs had filed their complaint with the Interstate Commerce Commission claiming unlawful refusal to furnish open-top cars in which to ship their coal and damages resulting to complainants therefrom, and that upon hearing, the reparations order was made by the Commission requiring payment of the sum of $2,000. Copies of the complaints filed with the Commission and the proceedings had thereon, including the final order of the Commission, were attached to the plaintiffs' petition and made a part thereof, in compliance with the requirements of 49 U.S.C.A. § 16, par. (2).[2]

The railroad company contends that the petition failed to state a cause of action for want of the above allegations and relies upon Baer Bros. Mercantile Co. v. Denver & R. G. R. Co. (D.C.) 200 F. 614.

Bearing in mind that the answer of the railroad company admitted "that said reports and orders of the Interstate Commerce Commission referred to in the complaint herein were made" but alleged that the orders were invalid, we do not find that the petition was insufficient to support the judgment. It was in form, as to the matters complained of, like that considered and upheld after judgment by the Supreme Court in Vicksburg, etc., Ry. Co. v. Anderson-Tully Co., 256 U.S. 408, 41 S.Ct. 524, 65 L.Ed. 1020, except that this petition did not refer to the act under which the suit was brought and did not contain the allegation "that the carrier had refused payment when demanded." It is clear that this suit was brought under the Interstate Commerce Act and equally clear that the railroad company, being fully advised of the reparations order, has denied liability and refused to pay. There is no requirement of the statute that the petition filed under the act must contain an allegation of notice or demand or refusal to pay. In so far as the decision in Baer Bros. Mercantile Co. v. Denver & R. G. R. Co., supra, is to a contrary effect we do not follow it, but follow Vicksburg, etc., Ry. Co. v. Anderson-Tully Co., supra, and ap-

prove Glens Falls Portland Cement Co. v. Delaware & Hudson Co. et al. (C.C.A.) 66 F.(2d) 490, and Jones v. Alton & S. R. Co. et al. (D.C.) 6 F.Supp. 807.

The railroad company further complains that there was no legal duty on its part to furnish open-top cars on its station track at Excelsior for wagon loading of coal. It had offered to furnish boxcars but such cars were refused because they were unsuitable for the plaintiffs' purposes in that the kind of coal they were producing could not be sold if loaded into boxcars. The railroad company relies upon Harp v. Choctaw, O. & G. R. Co. (C.C. A.8) 125 F. 445, and cases following or approving that decision (Choctaw, O. & G. R. Co. v. State, 73 Ark. 373, 84 S.W. 502, 92 S.W. 26; Robinson v. Baltimore & O. R. Co. (C.C.A.4) 129 F. 753; Platt v. Lecocq (C.C.A.8) 158 F. 723, 15 L.R.A. (N.S.) 558.

■ The question raised is as to the reasonableness of the carrier's practice. In the Harp Case, supra, it was pointed out that to furnish cars to the plaintiff for wagon loading would have been harmful to the public interest because it would have hindered traffic at a station which had become a large shipping point. The question being one of reasonableness, a refusal to furnish cars may be reasonable under certain conditions and arbitrary and unjust under others. The testimony in this case was that there was a surplus of open-top cars on the defendant's lines throughout the period in question; that the loading of coal into the boxcars which the company offered to supply would have interfered more with traffic than the loading into open-top cars, but that in fact there would have been no harmful interference by loading into open-top cars because the traffic at the point was negligible; that the refusal of the open-top cars was rested solely upon a so-called "policy" of the railroad company, adopted arbitrarily without any purpose of promoting the public interest. The question as to the reasonableness of the railroad company's practice of car distribution was an administrative question for the Interstate Commerce Commission (Midland Valley Railroad Company v. Barkley et al., 276 U.S. 482,

---

[2] 49 U.S.C.A. § 16, par. (2). "If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may file in the district court of the United States * * * a petition setting forth briefly the causes for which he claims damages, and the order of the commission in the premises," etc.

48 S.Ct. 342, 72 L.Ed. 664), and on the testimony before the Commission it rightly determined that the refusal of the open-top cars to the plaintiffs was unreasonable and unjust and in violation of the Interstate Commerce Act. See 49 U.S.C.A. § 1, par. (11), and section 3, par. (1).

A further complaint of the railroad company is that the evidence was insufficient to sustain a finding that damages amounting to $2,000, or any amount, was caused by its action in regard to the open-top cars.

The act under which this suit to recover upon the award of reparations was brought, provides: "Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the commission shall be prima facie evidence of the facts therein stated." 49 U.S.C.A. § 16, par. (2).

Accordingly, when the testimony was laid before the District Court, jury trial having been waived, his duty was to make decision thereon whether damage was in fact caused plaintiff by defendant's violation of the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.), and, if so, whether the amount arrived at by the Commission was proven. If the testimony permitted a fair inference either way, no weight was attributable to the finding and order of the Commission as evidence of the facts therein stated. The Commission's finding of damage and its award in reparation were "quasi-judicial acts" and "only prima facie correct insofar as they determine the fact and amount of damage,—as to which, since it involves the payment of money and taking of property, the carrier is, by § 16 of the act, given its day in court and the right to a judicial hearing." Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 921, 57 L.Ed. 1472; Baltimore & O. R. Co. et al. v. United States of America et al., 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209, filed May 18, 1936. Such was the position taken by the trial court. He made his findings upon consideration of the testimony. Our question is whether the findings are sustained by substantial testimony.

It appears that no damages were awarded plaintiffs for refusal to furnish them cars prior to the time when the station track at Excelsior was provided by the railroad company in February, 1929, nor after the time when the railroad company began to furnish them cars in February, 1930. The complainants made the contention before the Commission that they could and would have carried on extensive mining operations with hired labor and at a large profit if they had had the cars and they figured their lost profits upon such proposed operations up to $60,000; but no such claims were sustained. The conclusion of the Commission and of the District Court was that the mine which the plaintiffs had the right to work on a royalty basis afforded them an opportunity to get out coal with their own labor which they could sell for more money than they would be required to lay out for royalty, tools, materials, hauling, and necessary expenses. They had "a pump and a gasoline engine in the mine to pump water with," an old automobile engine for hoisting, some pit cars and track rails, mine timber and tools and "everything it takes to run a mine" (without a tipple). They were practical and experienced coal miners and had the work organized among themselves. Tom Williams, acting as foreman, prepared the entries, ventilation, and matters of that kind and attended to handling the cars to and from the working places in the mine. Sam Adams ran the power on top. The coal was hauled from the mine in wagons at a contract price, and the selling was handled by one W. C. Caudle. J. S. Adams kept such accounts as were kept but as to their accounting practice, Tom Williams testified: "We just dump the coal out and sell it and take out the cost of everything and divide up what we have left." There was no proof of any specific amount of gain from working the mine before the railroad company began furnishing the required cars on the station track in February, 1930. The testimony concerning what the men had done up to then was material only as it tended to establish the controlling fact that the men could and did mine coal and ship and sell an excess over what was locally disposed of in interstate commerce when they got the cars to ship in, and they had something left to divide up after they "took out the cost of everything."

After the cars became available, in February, 1930, there was a period of about six months, from March 1, 1930, to August 31, 1930, during which there was a record of the number of cars of coal that

had been produced and shipped in interstate commerce and the number of tons sold locally and also an account purporting to show the expenses incurred over the period. The Commission resorted to the record of this period to ascertain the loss or damage occasioned during the preceding year when the cars were wrongfully withheld and the right to reparation existed, although the evidence was that the demand for plaintiffs' coal declined during the six months' period from March to August, 1930, and they could not find sales for all the coal they could have produced.

During the six months' period 26 cars of coal were mined, of which 13 cars moved to destinations in other states. The average of these cars, 45.6 tons, applied to 26 cars gave a total of 1,185 tons as the minimum tonnage the complainants might reasonably have expected to ship in interstate commerce during the reparations period if cars had been furnished. The figure of 81 cents per ton was arrived at as the amount of expense the plaintiffs would have to lay out to produce and load the coal, and, as they had a contract with one W. C. Caudle to take their output at $2.50 per ton, the probable earnings from the labor of the complainants were figured at $1.69 per ton. Such per ton earning multiplied by the number of tons (1,185) produced the amount of damages awarded, $2,000.

Counsel for the railroad company in their exhaustive analysis and discussion of the testimony as related to the amount of damages have called attention to the fact, shown by the evidence, that of the 1,305 tons of coal disposed of between March 1, 1930, and August 31, 1930, some 389 tons had been mined prior to March 1 and should have been disregarded in estimating the ton production cost. Eliminating this tonnage, the cost figure per ton would be $1.04 instead of 81 cents, leaving the gain $1.46 per ton instead of $1.69, and producing a total damage of $1,730 instead of $2,000, and leaving the amount of the award which is supported by the evidence $1,730, and no more.

■ Careful consideration has been given to the numerous other objections to the computation of damages. We understand that the amount of money which the plaintiffs would have earned from laboring in the mine during the reparations period has not been demonstrated with mathematical accuracy. In the nature of things it could not be. But it is very clear that they were ready and willing and able to do the work and would have had something to divide between them and that they were damaged. In such a case the applicable rule of law is as stated by the Supreme Court in Story Parchment Company v. Paterson Parchment Paper Company et al., 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544: "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

■ Measured by this rule of law, we think that with the exception pointed out, the award and judgment of the court below is such a reasonable and probable estimate of damage as to produce fair, adequate compensation for the loss occasioned.

Our conclusion is that if the appellee shall, within thirty days from the filing of this opinion, file with the clerk of this court a remittitur from the judgment of the District Court in the sum of $270 (which we find to have been mistakenly included in the judgment), plus the interest on said sum of $270 since the rendition of the judgment, then the judgment of the District Court will be affirmed; the costs on this appeal to be paid by the party incurring them. If such remittitur is not so filed there will then be a reversal of the judgment.