INTERSTATE COMMERCE COMMIS-
SION and Southern Pacific Company,
a Corporation, Appellants,

v.

The MARTIN BROTHERS BOX COM-
PANY, a Corporation, Appellee.

No. 14077.

United States Court of Appeals,
Ninth Circuit.

Jan. 10, 1955.

Rehearing Denied March 1, 1955.

Edward M. Reidy, Chief Counsel, Samuel R. Howell, Asst. Chief Counsel, I.C.C., Washington, D. C., William L. Harrison, Atty., I.C.C., San Francisco, Cal., for appellant Interstate Commerce Commission.

James C. Dezendorf, George B. Campbell, Portland, Or., James E. Lyons, Charles W. Burkett, Jr., San Francisco, Cal., Stanfield Johnson, Washington, D. C., for appellant Southern Pac. Co.

George L. Quinn, Jr., Washington, D. C., Irving Rand, Donald A. Schafer, Portland, Or., for appellee.

Before HEALY, POPE and CHAMBERS, Circuit Judges.

HEALY, Circuit Judge.

In October of 1947 appellee, hereafter generally called Martin, filed a complaint with the Interstate Commerce Commission alleging that during the period January 1 to September 30, 1947, the Southern Pacific Company failed in its duty to provide and furnish complainant with an adequate supply of box cars for the transportation of its manufactured products from its Oakland, Oregon plant to interstate destinations, in violation of § 1(4) and (11) and § 3(1) of the Interstate Commerce Act, 49 U.S.C.A. § 1(4) and

(11) and § 3(1).[1] The relief asked was that the Commission enter an order commanding Southern Pacific to provide Martin with adequate and equal car service from Oakland, Oregon, to various destinations, and to pay Martin a sum in excess of two million dollars by way of damages. Southern Pacific intervened and in its answer denied the material allegations of the complaint.

The matter was assigned for formal hearings before an examiner for the Commission. Following such hearings the examiner made a proposed report recommending that the Commission find that Southern Pacific failed in its duty to furnish adequate car service to Martin and that damages be awarded the latter in the amount of approximately $135,000 for such failure.[2] Exceptions to the examiner's report were taken by Martin and Southern Pacific, and after argument Division 3 of the Commission made the report and order here under attack. In its report the Commission, under the heading "Conclusions," made, among others, the following ultimate finding: "We find that complainant has failed to establish that [Southern Pacific] during the complaint period engaged in any unreasonable or otherwise unlawful practice, as alleged, in violation of section 1 of the act in furnishing or not furnishing cars to complainant, * * * or that [Southern Pacific] subjected complainant to any undue prejudice in violation of section 3." The complaint was ordered dismissed.[3] Martin petitioned for reconsideration and its petition was denied by the entire Commission by unanimous vote of its membership.

Martin then filed a complaint in the court below naming the Commission and the United States as defendants. The complaint asked that the Commission's order be set aside as invalid for a variety of reasons. One of these was that the order lacks a rational basis because the findings do not support the Commission's conclusions. Another was that the Commission's findings of fact show that Martin was damaged and is entitled to reparation, and that such findings support no other conclusion. Other reasons assigned were that the Commission misapplied the law and that its action was arbitrary and capricious. The court was asked to enjoin and set aside the order and to re-

1. Section 1(4) in material part provides: "It shall be the duty of every common carrier subject to this part to provide and furnish transportation upon reasonable request therefor, * * *."

Section 1(11) provides: "It shall be the duty of every carrier by railroad subject to this part to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful."

Section 3(1) makes it unlawful for any carrier to make or give any undue or unreasonable preference or advantage to any particular person, firm, locality, region, district, or territory; or to subject any of such concerns or territories, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

2. The finding proposed by the examiner was in response to the claim of violation of the statute requiring rail carriers to furnish cars "on reasonable request."

No finding was recommended that the railroad had subjected the complainant to undue prejudice in contravention of Section 3 of the Act.

We may note here that the examiner's recommendations were not binding on the Commission. See Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 285–286, 53 S.Ct. 627, 636, 77 L.Ed. 1166, where the Court said: "Complaint is also made that the commission did not adopt the recommendations of its examiner. But the commission had the responsibility of decision and was not only at liberty but was required to reach its own conclusions upon the evidence." While this holding had to do with action of the Radio Commission, we have found in the authorities no indication that the same principle is not applicable to holdings of the Interstate Commerce Commission. See Inter-City Transp. Co. v. United States, D.C., 89 F.Supp. 441, 445, where the same principle was applied to a decision of the Interstate Commerce Commission, the court citing Nelson Bros. Co., supra.

3. Martin Bros. Box Co. v. Southern Pacific, 280 I.C.C. 395.

mand the case to the Commission with directions to award such damages as the court shall find Martin to be entitled to. Southern Pacific again intervened. On the basis of the record before the Commission the court made findings of fact and conclusions of law to the effect that the Commission's report and order are not supported by substantial evidence. Judgment was entered vacating the order and remanding the cause to the Commission with directions to take further action not inconsistent with the court's decision. The matter is before us on appeal from the judgment.

■ Preliminary to discussion of the case it is well to notice the narrow scope of judicial review of the Commission's orders. It is a long-established principle that such orders are not to be set aside by a court if they are within the Commission's statutory power and are supported by substantial evidence. Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308. To consider the weight of the evidence before the Commission, or the soundness of the reasoning by which its conclusions were reached, is beyond the province of the courts. Virginian Ry. Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463. The courts have historically ascribed to the findings of the Commission "the strength due to the judgments of a tribunal appointed by law and informed by experience." Illinois Central R. R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128. It must not be forgotten that the reviewing court was here confronted with transportation problems involving many factors and calling for the exercise of informed administrative judgment. As was observed by the Supreme Court in a case involving rates, "The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems." Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432.

■ It appears from the trial court's decision that it regarded the conclusions of the Commission, quoted above, as conclusions of law rather than as findings of ultimate fact.[4] Such approach is erroneous. The courts have repeatedly pointed out that whether given rates or practices are "reasonable" or "unduly prejudicial" are factual determinations confided by Congress to the judgment and discretion of the Commission. That this must be so is manifest since the sections of the Act involved contain no definition of what is reasonable or unreasonable or what constitutes undue prejudice. We quote from or summarize a few of the decisions. In Virginian Ry. Co. v. United States, supra, 272 U.S. at page 665, 47 S.Ct. at page 225, it was held: "The finding of reasonableness, like that of undue prejudice, is a determination of a fact by a tribunal 'informed by experience.'" In Nashville C. & St. L. Ry. v. Tennessee, 262 U.S. 318, 322, 43 S.Ct. 583, 585, 67 L.Ed. 999, it was said: "Whether a preference or discrimination is undue, unreasonable or unjust is ordinarily left to the Commission for decision; and the determination is to be made, as a question of fact, on the matters proved in the particular case." And in Swayne & Hoyt v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659, the Court said that whether a discrimination in rates or services is undue or un-

---

4. In its opinion the court said: "I previously indicated that the court is charged with the duty of determining whether there is a rational basis for the Commission's conclusions. Or, stated differently, whether the Commission's conclusions are supported by substantial evidence, considering the whole record, * * *."
   While it is true that under the heading denominated "Conclusions" in its report the Commission stated conclusions of law, it also made factual conclusions and ultimate findings under the same heading.

reasonable has always been regarded as peculiarly a question committed to the administrative body, based upon an appreciation of all the facts and circumstances affecting the traffic. Cf. also Johnston Seed Co. v. United States, 10 Cir., 191 F.2d 228.

■ In its report the Commission took notice of background conditions prevailing during the complaint period, saying:

"After the close of World War II, the Nation as a whole experienced a great industrial development, and during 1947 the Nation's railroads experienced for the first time since 1920, except in the war period, an average daily shortage of cars. * * * During 1947 the national daily shortage was 18,672 cars, and the defendant was individually faced with an average daily shortage of 583 cars of the types used for the transportation of forest products. Because of the sizeable surplus experienced prior to World War II, the Nation's railroads, including the defendant, did not anticipate the unusual demand for cars that arose in 1947.

"In addition to the increases in general traffic on the defendant's lines during and after World War II, it also experienced a tremendous increase in forest products traffic. * * * The defendant is the principal carrier in Oregon, and the number of cars loaded with forest products on its Portland division increased from 80,675 in 1939 to 162,418 in 1947.

"Another factor affecting the defendant's car supply in 1947 was a reversal of the main traffic flow over its lines after the war. During the war the main flow was westward, but with the close of hostilities in the Pacific theater, the main flow became eastward. During 1947 the defendant originated and delivered to its connecting carriers many more loaded cars than it received from such connections. During the war and postwar periods it exerted extensive efforts to conserve and increase its facilities. On these facts the defendant cannot be held accountable for general car shortages on its lines within the period covered by this complaint."

This resume of conditions has support in the record, and indeed, in many of its aspects, in common knowledge. In such circumstances it was inevitable that carriers would be faced with complaints by shippers, and the record shows that during the period in question Southern Pacific received thousands of such complaints.

The Commission impartially and at great length summarized the evidence adduced both by the complaining party and by the carrier. In no particular do we discover in the summary a distortion of the record made before the examiner.[5] While much of the summary recites evidence on Martin's part which would sup-

5. There is substantial testimony in the record to the effect that during the complaint period information given to Southern Pacific by Martin's employees as to the need for cars was conflicting, and that the road's representative told Martin's sales representative that it was essential for the shipper to place definite car orders so as to remove the confusion as to its needs. The testimony is in conflict as to the number of cars required by Martin from day to day. It was shown to be the practice of Southern Pacific to furnish cars to the shippers of lumber in Oregon, including Martin, when clear and definite orders for placing were received. It appears from the testimony of the car-

rier's witnesses that the road did not require that written orders for cars be placed, and that oral orders were honored when clear and definite as to Martin's daily need. Evidence for the carrier discloses that when shippers submitted oral orders, by telephone or otherwise, it was the practice of the carrier's agents to reduce them to writing on printed order forms. Pads of these forms were supplied all shippers. Also, there was a substantial showing that during the emergency the carrier endeavored to pro rate cars between shippers of lumber so that there might be an equitable distribution of the available supply.

port a ruling in its favor, the resume of the carrier's showing points substantially in the opposite direction. For example, we quote a portion of the report:

"In support of its contention that cars were distributed to the complainant on a reasonable basis, the defendant showed that during the period concerned the complainant received more cars than it requested by written car orders,[6] whereas other shippers on its lines, including the Portland division, were furnished on the average only 80 per cent of the cars ordered by them. From January 1 to June 30, 1947, cars were furnished to the complainant in practically complete compliance with written car orders, and in the remainder of the period more cars then ordered were furnished, but some delay was encountered. In the latter period, the distribution of cars to shippers on the Portland division, including the complainant, was made on a percentage-of-quota basis; that is, if the available car supply on a particular day was only 50 per cent of the aggregate capacity of the district, each shipper was assigned only 50 per cent of its quota, except that no cars would be assigned to a shipper which had no orders on file. During the first 6 months of the complaint period, the car shortage was not as severe as during the later period; but some shortage did exist, and cars were allegedly distributed to each shipper in proportion to the number of empty cars available."

Later in the summary attention was called to evidence in the record that a number of cars were kept on hand upon the complainant's siding for several days during much of the complaint period. One car was on hand 7 days, two were on hand 6 days, eleven were on hand on 5 days, twenty-two on hand on 4 days, and fifty-six on hand on 3 days. The Commission thought that these facts were relevant in consideration of the complainant's ability to load cars in addition to those which were furnished.

In its conclusions the Commission stated: "The evidence establishes that from January 1 to June 30, 1947, complainant received practically all of the cars for which specific written car orders were placed; that thereafter in the complaint period more cars were furnished than were requested by written orders, though some delays were experienced; that complainant desired, required, and attempted to secure additional cars from defendant; that defendant and its employees made reasonable, and sometimes successful, efforts to furnish additional cars to complainant; that by reason of its inability to secure cars at all times when needed complainant was unable to fill some orders placed with it; that during 1947 defendant suffered a daily shortage of 583 freight cars; that such shortage was a general one for which no direct responsibility can be placed upon defendant; *and that it is not shown that defendant unduly favored shippers other than complainant.*" [Emphasis ours.]

In disposing of the shipper's complaint the Commission said: "Complainant alleges violations of section 1(4), section 1(11) and section 3(1) of the Interstate Commerce Act. Under those sections defendant is required, in part, to provide and furnish transportation upon reasonable request; to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and not to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, locality, or territory. The right of a shipper to cars, however, is not an absolute right and the carrier is not liable if its failure to furnish cars was the result of sudden and great demands which it had no reason to apprehend would be made and which it could not reasonably have been expected to meet in full. The law exacts only what is reasonable from such carriers, but at the same time requires that they should be equally reasonable in the

6. See footnote 5.

treatment of their patrons. In case of car shortage occasioned by unexpected demands, they are bound to treat shippers fairly, if not identically. [Citing authorities.] Considering the above, in the light of the facts of this record, we conclude that complainant has failed to establish any violation of sections 1 and 3 as alleged." [7]

The Commission analyzed in detail the shipper's showing with respect to damages claimed to have been sustained by reason of a shortage of cars at shipper's Oakland, Oregon, plant. It observed that the shipper's computations were made for the entire year, and that "no method is indicated for arriving at a reasonable estimate for the complaint period. They are based to a great extent upon the operation of the complainant's corrugated-box plant at Aurora, which was in no way affected during the complaint period by the situation at Oakland." Further, the Commission held inapposite certain comparisons made by the shipper with prior years. In its conclusions on this point the Commission found that "the evidence presented falls far short of the requirements in a proceeding of this character to support an award of reparation. Where special damages are sought, the proof thereof must be as definite and certain as would be necessary under established principles of law to support a judgment in court." [Citing previous decisions.]

A majority of the court are of opinion that the shipper's proof of damages was sufficiently specific to have supported an award in some amount had the Commission held in favor of the shipper on the issue of statutory violation. Accordingly our decision is predicated on grounds other than that developed in the preceding paragraph.

The judgment of the district court is reversed.

CHAMBERS, Circuit Judge (concurring).

The examiner of the Interstate Commerce Commission who held hearings on the complaint of Martin Brothers Box Company found an unfair discrimination by Southern Pacific Company. He recommended substantial damages or reparation. If I thought the district court and this court had the same latitude with respect to reviewing an order of the Interstate Commerce Commission that the Commission has in following or rejecting a recommendation of the examiner, I would vote to uphold the examiner.

But on the ground that under the record the Commission was not clearly wrong in finding there was no undue discrimination under the circumstances of the case, I concur in the result reached by Judge Healy. If the Commission had found there was undue discrimination but that under the evidence it could not fix damages, then I would join Judge Pope.

There is evidence here of substantial damage caused by the car shortage. If Southern Pacific is legally responsible, then the Commission should come up with a reasonable figure for this damage, and an intelligent estimate would be satisfactory.

POPE, Circuit Judge (dissenting).

Judge Healy's opinion cites many of the leading decisions of the Supreme Court noting the narrow scope of judicial review of the Commission's orders. It quotes at considerable length the authorities referring to the deference due the findings of a tribunal "informed by experience". But unfortunately for the

7. An argument is advanced that the Commission misinterpreted the requirements of section 3(1) of the Interstate Commerce Act, in that it is said to have believed there could be no violation of the section unless undue preference was extended to *competitors* of the complaining shipper. The Commission's report and findings afford no basis for the argument.

In this connection it is significant to recall that even the much relied upon report of the examiner did not recommend a finding that the carrier had subjected the complainant to undue prejudice in contravention of section 3 of the Act. See footnote 2 above.

right of the matter here, those impeccable authorities have no application to the facts of this case. This is not the kind of case to which the language quoted from the Supreme Court is addressed. On the contrary, this is a case in which all of the evidence, both that of the complainant and that of the carrier, shows with certainty that there was an unlawful preference and unreasonable prejudice and disadvantage to the complainant within the meaning of the Act. There was no evidence whatever to the contrary. Furthermore, the Commission's failure to take account of this, the fact that it ignored it, is explained by the Commission's demonstrable mistake of law in wholly disregarding statutory standards. But above and beyond the fact that the decision here disregards the rights of the shipper involved, I think it can be demonstrated, as I propose to do, that if this decision stands the railroads can proceed, wholly without hindrance from the Commission, so to pick and choose among shippers that they will, in many instances, be exercising the power to say which industries shall live and which shall die. What has happened here appears to me to be an unthinkable abnegation of its duties by the Commission.

I think it is important to note here that certain allegations of the complaint before the Commission were not disputed by the defendant company and that upon those issues the findings of the Commission support the complaint. Thus there is no question here that the complainant desired, required and attempted to procure more cars than it got. The report of the Commission recites: "The complainant indicated generally that it wanted more cars than were furnished and this is admitted by the Oakland agent of the defendant." Among the conclusions of the Commission was one that: "Complainant desired, required and attempted to secure additional cars from defendant." Nor is there any question here but that the complainant made "reasonable request" therefor within the meaning of § 1(4) of the Act, 49 U.S. C.A. § 1(4). There is no finding that such request was not made.

In my view the heart of this case relates to agency action which is arbitrary, capricious and an abuse of discretion because it is in disregard of undisputed and indisputable evidence; because it has no rational basis; and because it proceeds upon a misapprehension of the applicable sections of the Act and hence it is not in accordance with law. If I am right in these views as to where the Commission disregarded the facts, and as to how it misinterpreted the law, there can be no doubt as to the authority of the reviewing court to set the agency action aside. 5 U.S.C.A. § 1009(e).

As the prevailing opinion discloses, the complaint was based in part upon an alleged violation of § 3(1) of the Act which recites that it shall be unlawful for a carrier "to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, * * * in any respect whatsoever; or to subject any particular person, company, firm * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." I think that not only the evidence of the complainant but that of the carrier as well, shows an unlawful preference and unreasonable prejudice or disadvantage within the meaning of the Act.[1] It is true that in

1. Footnotes 2 and 7 of Judge Healy's opinion suggest that the examiner did not recommend a finding that the railroad had subjected the complainant to undue prejudice in violation of section 3. Exactly the contrary is the case. The examiner recited the tabulations showing that six shippers at Portland, Eugene and Salem (served by competing carriers) "encountered little delay in receiving cars", while complainant's plant, during the same period, encountered "a considerable amount of delay". He cited the large lumber company at Portland that ordered cars by phone "and experienced no difficulty in obtaining cars." He pointed out, as I do hereafter (note 5, infra), that the carrier's distribution to complainant on the basis of percentage of written orders filed was irrational under the circum-

its conclusions the Commission recited: "That it is not shown that defendant unduly favored shippers other than complainant;" but I think that the trial court correctly held and found that the Commission in reaching that conclusion rode too hard upon the word 'unduly' and based such conclusion not upon any findings of fact but upon a misreading and misinterpretation of the statutory provision just alluded to.

The Commission recited at considerable length the testimony given by one of the complainant's salesmen who stopped taking orders and at different intervals was permitted to go to Oakland to aid in an attempt to obtain more cars for the complainant. It is obvious that the Commission fully credited his testimony for it made what this witness said a part of its findings: "He made trips to Medford, Oreg., and called on the defendant's division freight and passenger agent who agreed to do all he could to afford relief. He also called on the defendant's freight traffic manager at Portland and discussed the situation. In one discussion with that official he was informed that the complainant's fixed freight-car quota was only 5 cars a day, or the same as that assigned to the former owner of the Oakland mill. He was later told that the quota would be changed to 10 cars a day, but that because of the car shortage there was doubt that the complainant could be given more than 50 per cent of its quota."

The Commission's report recited at length the history of the complainant's purchase of the Oakland mill and of how the facilities of that mill were enlarged and improved and its output multiplied. The Commission's findings show that these plans for enlarging the mill and the increase of the freight car requirements to 13 cars per day were discussed with its officers there before the complainant exercised its options to buy the mill. The findings of the Commission in the quotation last made in which quotas are referred to, are necessarily a recognition that a "quota" of five cars a day, the same as that assigned to the former owner of the mill, would have no relation whatever to the reasonable requirements of complainant.[2] At any rate it must be taken that complainant's requirements

stances, and calculated to discriminate, and he concluded that "complainant did not receive its fair share of the cars available * * * and that defendant should have furnished to complainant about 80 percent of its requirements, the percentage figure that it admits were furnished on the average to other shippers on its lines during this period." It was this discrimination, resulting in complainant not getting "its fair share," upon which the examiner's recommendation of reparation was based.

2. The Commission properly makes no allusion to a claim by the carrier that the complainant's requests for cars were conflicting or uncertain. (This is the matter referred to in the court's footnote 5 to which I shall refer later.) The record discloses that the carrier had written notice of complainant's requirements. Defendant's Exhibit 12 is a file of letters and telegrams received from the complainant including two letters dated July 30, 1946, one sent to the defendant at San Francisco and the other at Los Angeles, in which the carrier was advised that the complainant had a minimum requirement of 36 empty cars per week. In one of these letters complainant stated also: "Unless we can secure quick relief from your good company, we will be required to shut down the plant until something can be worked out for us. Some twenty to twenty-five carloads of manufactured material, including shook for perishables and housing lumber, are on our dock at Oakland, Oregon, awaiting cars, and literally have choked off additional production until we get cars." On August 6, 1946, the carrier was advised that although for the long pull more would be required: "Our minimum requirements, in order to keep our plant running at a minimum, we require not less than 150 cars per month." The same file contains copies of telegrams and letters from complainant from as early as August 30, 1946, to as late as September 26, 1947, requesting in terms of desperation that it be furnished more cars. In view of these written requests, neither of which was ever complied with, the defendant cannot have been in doubt as to what was requested. No doubt if the calculation were carried out to 3 or 4 decimal points there would be some difference between 36 cars per week and 150 cars per month, so that viewed thus microscopically these two

were at least seven cars a day; nor is there any finding inconsistent therewith.

The majority opinion in my view misinterprets the commission's report. Thus a little more than half way through the opinion it is stated: "For example, we quote a portion of the report: * * *." Then follows a paragraph copied and quoted from the report. The opinion gives the impression that this paragraph thus quoted out of context was what the Commission found. It was no such thing. It was a mere recital by the Commission of what defendant argued. This is not only plain from the use of the word "allegedly" which appears in the next to the last line, but it is clearly evident from the text of the report.

The Commission made its own findings with respect to these written car orders referred to in the quoted argument. After explaining how those orders were made up,—that the complainant's employee would go to the carrier's local agent and after telephoning the defendant's office at Eugene to find out how many cars had been assigned to complainant that day, he would then make out the written orders for the cars thus assigned, the Commission proceeds: "The complainant indicated generally that it wanted more cars than were fur-

nished and this is admitted by the Oakland agent of the defendant. It appears that the written car order blanks, which were filled out and given to the defendant's agent after the complainant knew what cars had been assigned to it for the particular day, were to a large extent nothing more than a written confirmation, for the defendant's records, that the complainant wanted the cars that had been assigned to it for that day."

Thus the Commission found, as did the trial judge, that the written car orders placed by the complainant with the defendant were no indication of the number of cars required. To try to read the paragraph quoted in the majority opinion as representing some finding of the Commission, would be to convict the Commission of a meaningless play on words. The statement in the quoted paragraph that "during the period concerned the complainant received more cars than it requested by written car orders", is wholly irrelevant in view of the Commission's finding that the written car orders were made out in the manner described by the Commission and had no relation to the complainant's request or requirements.[3] There is no evidence whatever that the Commission accepted this ir-

sets of written requests could be called "conflicting". At 5 days per week or 21 days per month, whichever it be, the amount is 7 plus cars per day. Nelson, the defendant's freight traffic manager who made an effort to testify to conflicting orders, not only demonstrated his inability to make this simple mathematical calculation but based his testimony as to the divergent orders on what some other employee of the defendant told him. This simple hearsay relating to conversations with other company employees was not only disregarded by the Commission but obviously it furnished no excuse for a failure to determine that complainant was requesting not less than 7 cars per day.

The Commission's report sufficiently discloses that complainant's needs were at least equal to its requests. The report refers to the estimate of complainant's president that its production capacity was

8.4 carloads per day. The Commission found that throughout the period here in question "complainant had orders that were sufficient for operation of the Oakland plant at capacity during this period." It then proceeded to recite the lengths to which complainant had to go by reason of its inability to operate at capacity, its resorting to deliveries by truck, its cancelling of orders, and its having to turn to other products.

3. There can be no doubt but that the Commission understood this language quoted in the majority opinion as being but a recital of what the defendant argued and nothing more for it copied that paragraph from the report of the examiner whose general findings were in favor of the complainant. The Commission must have understood the examiner in framing this paragraph to be making a mere recital of a party's contention and must have included it in its report with like intent.

rational suggestion that it was important that complainant received more cars than those listed in the written orders.

There is much more evidence that the Commission credited and accepted the testimony of a witness whom it described as "a person with considerable transportation experience". Its summary of this witness' tabulations of the records of car orders and deliveries and of his testimony generally was copied in the report verbatim from the recommended report of the examiner. The Commission refers to this person's testimony to the effect that the delay in filling car orders occurred at noncompetitive points such as Oakland, Oregon, where complainant's mill was located. The Commission refers to his tabulation taken from the defendant's car order records relating to orders and deliveries to three shippers at Eugene, two at Portland, and one at Salem, during July, August and September, 1947, the period when the greatest delay occurred in respect to complainant's car orders. It is recited with respect to the complainant that "from July to September, inclusive, a considerable amount of delay in receiving cars was encountered. They (the tabulations) also indicated that the six shippers encountered little delay in receiving cars during the period covered * * *. During and prior to the complaint period, this witness was traffic manager of a large lumber company with its main plant at Portland. That company ordered its cars by phone and experienced no difficulty in obtaining cars from the defendant during 1947."

It is plain that the examiner who heard this and the other witnesses in person, credited that testimony fully for he found that "during the period from January to September inclusive, complainant did not receive its fair share of the cars available." But without suggesting that this witness of whose capacity and extensive research the Commission speaks so highly, was one whom the Commission was obliged to believe and credit, yet it is apparent that the statistics and records furnished by the defendant itself compelled a conclusion that the facts were in accord with what this witness discovered.

The trial judge in his findings shows that even before the period of greatest shortage in July, August, and September, the plaintiff was already receiving the short end of the stick. Taking his figures from the defendant's exhibits, he shows that for the month of April, 1947, when there was "a slight box car shortage" for one week and no shortage for two other weeks, and when users generally on the Portland division were furnished 92% of the box cars ordered, the plaintiff received only 40 such cars. Assuming a 21 day month and a requirement and request of seven cars per day, this means that even in April complainant was receiving only 40/147 of its needs or slightly more than 27% against the 92% furnished car users in the aggregate. The trial court showed from the same exhibits of the defendant that in the month of May, when there was no shortage of box cars, plaintiff received 54 cars or 54/147 or 36% of its assumed requirements.

The real question, however, is how did plaintiff fare in July, August and September? Defendant's exhibit 31 shows that upon its Portland division taken as a whole it supplied 77% of the cars ordered in the month of July. Its exhibit 41 shows that in that month complainant received a total of 62 cars,[4] or less than 50% of its requested requirements. In the month of August the same exhibits make an overall showing that 65% of all

4. In referring to the number of cars, as in the opinion of the trial court and in that of the Commission, numbers given are the "adjusted" totals. Some of the cars furnished were refrigerator cars in place of box cars. As these cars lacked the capacity of box cars, two or three refrigerator cars were counted as the equivalent of one box car depending upon the size of the box car ordered. This was in accordance with a service order of the Commission which recognized this ratio. The totals arrived at in this manner were referred to as the "adjusted" totals.

cars ordered were furnished generally, while complainant got a total of 58 or slightly less than 40% of its require- ments. For September the figures are 58% furnished overall and 58 cars or 40% supplied to the complainant.

I do not think that the Commission overlooked this evidence of discrepancies. Nor was the evidence of the witness mentioned, or his tabulations challenged by the carrier.[5] The Commission's re- port shows on its face that it simply ig- nored and disregarded these undisputed facts because of a fundamental error on the part of the Commission as to the meaning of the Act. The report states: "In rebuttal of evidence in behalf of the complainant purporting to indicate that shippers at Portland, Eugene, and other terminals in general received better serv- ice than did the complainant, the defend- ant points out that the *complainant has not shown that it is in competition with any shipper at such points,* and that con- ditions and circumstances affecting the promptness of car supply at terminals are such as necessarily give shippers there located a natural advantage over shippers at nonterminal points. At ter- minals the yard engines are usually em- ployed on a 24 hour basis and there is generally an influx of loads to the ter- minals which produce empty cars. The complainant has not established *that any of its competitors* was unduly preferred by the practices of the defendant here assailed." (Emphasis supplied.)

The last sentence quoted is the Com- mission's finding. Its significance in the case is made clear by the position taken by the Commission in its brief filed in this court which states: "The record al- so fails to show that appellee was sub- jected to competition since it produced only wirebound boxes and was not en- gaged in the sale of lumber as such. In the absence of proof of competition an allegation of undue prejudice and prefer- ence cannot be sustained." I think that this is the clue to the otherwise unex- plained action of the Commission in ig- noring the undisputed evidence of dis- crimination. With respect to this the trial judge said: "Nothing in the Act and no decision that I have been able to find permits discrimination as between shippers merely because they are not in the same type of business and therefore do not compete against each other."

It is clear upon both reason and au- thority that the trial judge was right in this statement of the law, and because the record compels the conclusion that the Commission here proceeded upon the same misapprehension of the law and the meaning of the Act which is quoted above from the Commission's brief, I am of the opinion that the trial judge was right in setting aside the Commis- sion's order.

Of course under the doctrine pro- nounced in the cases, some of which are cited in the majority opinion relating to the scope of judicial review of the Com-

5. As pointed out by the trial judge in part No. VI of his opinion and findings, an attempt was made by a witness for the carrier, the chief clerk of its division su- perintendent, to show that during the pe- riod in question the carrier put into effect a distribution or rationing rule based up- on the production capacity of its ship- pers in the lumber industry whereby each would get its proportionate share of the total cars available. But as the court there notes, the system was completely nullified because the witness disclosed the carrier was proceeding upon the theory that its obligation was limited with re- spect to the complainant and the other shippers by the number of written car orders on file. This witness testified as quoted by the trial court: "We would take into consideration the car orders that were filed by the mill." He also said: "Q. Would you furnish to the mill cars if there were no car orders on file? A. No sir." As above indicated, the presence or absence of written car orders were without significance with respect to the complainant's requirements or re- quests. A distribution or rationing sys- tem of the kind described by this witness which proceeded upon the theory that al- location or distribution must be based up- on or measured by the number of orders on file would naturally result in this case in the discrimination which the defend- ant's records disclose.

mission's orders, the finding of the Commission upon the question of whether or not there exists in a given case "undue or unreasonable preference or advantage" will not be disturbed upon court review so long as there is "warrant in the record" and a "rational basis for the Commission's conclusions". But such rule cannot be applied where there has been a disregard of statutory standards. Central R. Co. of New Jersey v. United States, 257 U.S. 247, 42 S.Ct. 80, 66 L. Ed. 217. In such a case, or where, as here, the order was rendered without any evidence whatever to support it, "the consideration of such a question involves not an issue of fact, but one of law, which it is the duty of the courts to examine and decide." Florida East Coast R. Co. v. United States, 234 U.S. 167, 185, 34 S.Ct. 867, 872, 58 L.Ed. 1267.

I think it is elementary that upon a review such as this, the Commission's decision must be supported by sufficient findings and an adequate record. Even if there were doubt as to whether the Commission was proceeding upon the theory that the complainant must be denied relief in the absence of proof of competition, yet the very existence of the doubt would alone and without more require a reversal of its order because of the inadequacy and lack of clarity of the record. See Eastern-Central Motor

Carriers Ass'n v. United States, 321 U.S. 194, 210, 64 S.Ct. 499, 88 L.Ed. 668; United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023.

Notwithstanding the judge, in the language quoted, challenged the appellants here to find something in the Act and some decision which he said he had not been able to find which permits discrimination as between shippers because they do not compete, the appellants have not undertaken here to cite the decision of any court to such effect.[6]

According to the position taken by the Commission the carrier could with propriety say to Martin Brothers: "You are the only manufacturer of wire bound boxes shipping over our line and since you have no competitors we will give you just as many cars as we please;" or, (as complainant's president testified it did say) "You cannot expect us to take cars from other shippers with a good pay-bottom load and give them to you for wire bound boxes."[7]

Of course it is well established that in certain cases involving transportation service and charges, competitive conditions may justify diversity in service or rates. Barringer & Co. v. United States, 319 U.S. 1, 7, 63 S.Ct. 967, 87 L.Ed. 1171. Examples of such cases are where ship-

---

6. The only authority cited to support the above quoted statement from the Commission's brief are three decisions of the Commission: Americus & Co. v. Pennsylvania R. R. Co., 181 I.C.C. 5, 10; California Cotton Oil Corp. v. Atchison, T. & S. F. Ry. Co., 218 I.C.C. 97, 105; Traffic Bureau, Lynchburg Cham. of Com. v. C. & O. Ry. Co., 234 I.C.C. 765, 768. None of the cases cited has any bearing upon the point here discussed. The last cited case involved a complaint that rates on carload shipments of sugar from Baltimore, Maryland, to Lynchburg, Va., were unreasonable when compared with rates on the same commodity from Baltimore to Richmond and Charlottesville. Not only was the allegation of unjust discrimination withdrawn at the hearing but the dismissal of the complaint was based upon a finding of motor truck and water competition which affected the rates to Richmond and Charlottesville but which

competitive conditions were not present at Lynchburg. The case was therefore one covered by the rule applied in Barringer & Co. v. United States, infra. The same thing is true of the other two cases cited.

7. Whether this conversation did or did not take place, the possibility that a carrier might be moved by such considerations discloses a reason why the Commission's attitude toward the necessity of complainant showing favoritism to a competitor is wholly unacceptable. It was surely not the purpose of Congress to put it within the power of a carrier to determine what sort of commerce shall move and what shall not move by furnishing cars to shippers with the more lucrative traffic and refusing cars to shippers with less paying traffic and justifying the discrimination on the ground that the latter are not in competition with the former.

ments over one line meet no competition and demand higher rates than over another line where that competition exists.[8] But as pointed out in the Barringer case, supra, 319 U.S. at page 9, 63 S.Ct. at page 972, that principle has no application whatever to a case of the kind here present. The court said: "We have repeatedly sustained a finding of the Commission that such a difference, based on a difference in identity of shippers or the ownership of the goods shipped, or on other circumstances *irrelevant to the carrier service rendered*, is an unjust discrimination to shippers." (Emphasis added.) Thus in Interstate Commerce Commission v. Balt. & Ohio R. R., 225 U. S. 326, 32 S.Ct. 742, 747, 56 L.Ed. 1107, the alleged unlawful discrimination related to a different rate for the transportation of coal to a given point for the use of railroads than for coal to the same point for other shippers. There, of course, the railroads shipping the railroad fuel-coal were not in competition with the other shippers. It was argued: The fuel coal thus shipped was not in competition with the commercial coal shipped to the same point. Alluding to this the court said: "But such features do not affect the carriage, qualify or alter the essential service, which is to get an article from one place to another. The greater or less inducement to seek the service is not the service. *Such competition, therefore, is as extraneous to the transportation as the instances in the cases cited*." (Emphasis added.)

The reason the trial court was unable to find a decision that permits discrimination as between shippers merely because they are not in the same type of business and do not compete against each other, is in my opinion due primarily to the fact that such a rule as here urged by the Commission has never occurred to any court. Decisions finding an unlawful discrimination in violation of § 3(1) have not suggested that a shipper must prove that the persons receiving the favored treatment are his competitors. Thus in Baltimore & Ohio R. Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, the court held that the Commission had properly ordered carriers to refrain from furnishing storage and warehousing to a preferred group of large shippers. While it is true that the result of the railroad's practices was competition between the railroads on the one hand and the owners of other warehouses on the other, yet the vice of the arrangement was held by the court to rise from the discrimination between shippers. The court said at page 524, of 305 U.S., at page 290, of 59 S.Ct. "Since the carrier warehouse rates, as found by the Court and Commission, are not open to all shippers alike there is violation of sections 2 and 3(1) prohibiting discrimination and unreasonable prejudice."

Obviously it did not occur to the court to make its statement read: "are not open to all *competing* shippers alike". In that case it appears that among the persons favored were distributors of flour. To my mind it would be unthinkable that the discriminations there involved could be upheld if the carriers permitted all distributors of flour, without exception to have the special warehousing services, just so those denied this privilege were not distributors of flour. In Louisville & N. R. Co. v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672, the practice condemned was the free hauling by carriers of private cars belonging to other carriers. Private cars belonging to other persons and concerns were charged for like services. Although the owners of the cars thus charged were not in competition with the carriers who had the free service, it was not even argued that the lack of competition would justify the discrimination.

The fact that the complainant here was located at a point reached exclusively by the defendant's line, and the favored shippers were, as the witness above men-

---

8. Some of these cases are collected in the footnote to Eastern-Central Motor Carriers Ass'n v. United States, supra, 321 U.S. at page 202, 64 S.Ct. at page 503.

tioned testified, frequently at points reached by competing carriers, cannot as a matter of law justify a discrimination against the complainant. Seaboard Air Line Ry. Co. v. United States, 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129. As the court said in that case: "The principle established in these cases is that the statute aims to establish equality of rights among shippers for carriage under substantially similar circumstances and conditions, and that the exigencies of competition do not justify discrimination against shippers for substantially like services." 254 U.S. at page 62, 41 S. Ct. at page 25.[9]

The majority opinion, in its footnote 5, refers to certain testimony in the record to the effect that information given by the complainant to the carrier as to cars required was conflicting. See note 2, supra. If this be an effort to supply something which the Commission chose to omit from its report, or, if it be designed to supplement the Commission's findings, I have only to say that it is not a part of the functions of this court to make such findings of fact. For reasons satisfactory to the Commission it concluded, as I have shown, that complainant needed and attempted to secure more cars than it received. As I have suggested above, there is no issue here with respect to the complainant having made a reasonable request within the meaning of the Act. If footnote 5 is designed to show some lack of a reasonable request, it is simply out of order here unless it is to be interpreted as a suggestion to be made to the Commission if the matter is to be remanded for further hearing by that body.

Likewise out of place in the opinion is the reference to some evidence that a number of cars were on certain days kept on hand for an extended period of time. I think that what the trial court said

about this reference to the retention of cars is irrefutable. As the trial judge pointed out the Commission itself based no ultimate finding upon these isolated circumstances of detained cars and said that the holding of them was "relevant" in " 'a consideration of the complainant's ability to load cars in addition to those which were furnished.' " But this mere comment of the Commission becomes of no significance in view of the conclusion that the complainant desired and required cars in addition to those which it received. Obviously the Commission had no doubt of the ability to load the cars. Unquestionably this complainant had to lay off entire shifts of employees and had to suspend the activities of its salesmen when its yards became stacked with finished material for which it had no cars. In that sort of picture, evidence that might be relevant to a consideration of complainant's ability to load additional cars becomes too trivial to merit a reference.

Admittedly it is no part of the function of the court below to make findings of fact which would be in disagreement with findings made by the Commission based upon substantial evidence. But here the trial court made its findings by the simple process of adding a column of figures furnished by the carrier,—figures which confirmed the testimony of the complainant's witnesses. The finding was that the complainant received an adjusted total of 593 cars during the complaint period or an average of 3.1 cars for each working day. For the reasons which I have heretofore pointed out, I think that the Commission simply thought this calculation unimportant and irrelevant, and refrained from making any computation for itself because of its interpretation of the Act's requirements as to the treatment due a shipper who happens to be the only shipper on the line shipping a specified product.

9. The unreasonableness of any discrimination against shippers at intermediate or non-competitive stations, in favor of those at terminal competitive points, is manifest, for discrimination is expressly prohibited even against shippers on lateral or branch lines by § 1(9), Title 49, § 1(9). Cf. United States ex rel. Pitcairn Coal Co. v. Baltimore & O. R. Co., 4 Cir., 165 F. 113, 131, reversed on other grounds, 215 U.S. 481, 30 S.Ct. 164, 54 L.Ed. 292.

As noted in Judge Chambers' opinion, he and I are both agreed that there was substantial evidence of damage. The *reality* of the damage was strikingly demonstrated. A fully equipped box-making plant, with a backlog of orders for 242 carloads of product, was choked down from a three-shift to a one-shift operation for want of cars, its orders were canceled for inability to make delivery, it had to take its salesmen off the road, and even so was compelled to resort to unsuitable deliveries by truck and to expend large sums to adapt the mill for the production of other products. The *amount* of the claimed loss, when scaled down as it was by the examiner, was not speculative or uncertain, as the trial court points out. If there was any damage it was the duty of the Commission to order reparation. Story Parchment Co. v. Patterson Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544; Midland Valley R. Co. v. Excelsior Coal Co., 8 Cir., 86 F.2d 177, 183.

In my view the judgment of the trial court should be affirmed.